UNITED STATES of America, Appellee,

v.

Thomas William VOICE, Appellant.

No. 80–1057.

United States Court of Appeals,
Eighth Circuit.

Submitted May 20, 1980.

Decided Aug. 8, 1980.

David L. Bergren, Fort Pierre, S.D., for appellant.

Bonnie P. Ulrich, Asst. U.S. Atty., Sioux Falls, S.D., argued, Terry L. Pechota, U.S. Atty., Sioux Falls, S.D., on brief, for appellee.

Before HEANEY, BRIGHT and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

Defendant Thomas William Voice appeals his conviction of second degree murder under the Major Crimes Act of 1855, 18 U.S.C. § 1153. His principal contentions on appeal are that the district court[1] erred in (1) finding defendant competent to stand trial, (2) failing to suppress evidence of defendant's inculpatory statements, and (3) permitting the jury to find sufficient evidence that defendant committed the offense and was legally sane while doing so. We affirm the conviction.

Defendant was arrested May 21, 1979 for the beating death of Scottie Abernathy on May 20. The death occurred in Fort Thompson, South Dakota, within the Crow Creek Indian Reservation. A murder complaint was filed May 22 and a superseding indictment was filed July 12, both charging defendant with violating 18 U.S.C. §§ 1153,

---

1. The Honorable Donald J. Porter, United States District Judge for the District of South Dakota.

1111.[2] Defendant was provided with counsel and examined by psychiatrists and psychologists prior to trial. The district court held a hearing on August 27 and on August 30 issued an opinion finding defendant mentally competent to stand trial. On December 19, 1979, after a six-day trial, the jury found defendant guilty of second degree murder. The court sentenced defendant to life imprisonment.

## I. Background

Viewing the evidence in the light most favorable to the verdict, see *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we summarize the events leading to conviction before recounting the evidence in detail as discussion of defendant's contentions requires. Between 10:00 and 11:00 a. m. on May 20, 1979, defendant shopped at the Big Bend Store in Fort Thompson. As defendant was leaving, Larry Abernathy, the owner of the store, stopped defendant and insisted he pay for the pair of blue jeans concealed beneath his clothes. Defendant gave money to Abernathy's fourteen year old son, Scottie, who was tending the till. As Scottie made change, defendant complained he was being cheated. After an argument with Scottie and Larry Abernathy, defendant relented and walked out of the store. He went to the residence of his cousin Velda Howe. After conversing with several people at the Howe residence and watching television there, defendant walked back toward the Abernathy store. Visitors leaving the store at about 11:15 a. m. saw defendant next door, in front of the Big Bend Motel. The Abernathys lived in the motel while they were working at the store.

Scottie Abernathy was last seen alive at the Abernathy store shortly before noon. His father noticed his absence and began to look for him. At about 12:45 p.m. he found Scottie's body on a couch in the motel office, his head beaten in with several blows of a baseball bat. The bat was found on an ottoman in the room. Prior to its use the bat had been stored in a motel hallway underneath a shelf.

The defendant was at a gas station directly south of the motel and store at about 12:30 p.m. He walked to the motel when a crowd gathered in response to the discovery of Scottie Abernathy's body. On defendant's shirt at this time was a spot of human blood in a quantity too small to be identified as to type. Defendant was questioned at the scene by Gerald Lytle, a Fort Thompson police officer. Defendant told Lytle he wanted to see his counselor, a social worker in a nearby town. Lytle took defendant to the police station but did not question him further.

That afternoon, at about five p.m., FBI agents interviewed defendant for about one hour. Defendant denied killing Scottie Abernathy and was permitted to go home.

That evening, defendant told his brother-in-law, Quinton McGhee, that he had killed "Jackie" by splitting his head open with a baseball bat. Defendant told McGhee he had assaulted "Jackie" because Larry Abernathy had tried to make defendant pay for a pair of pants he was wearing. Defendant stated he had thrown the bat behind "the couch" after using it. He opined there must have been a gallon of blood on the couch.

Defendant was arrested the next afternoon for the murder of Scottie Abernathy. Both before and after the arrest, defendant made statements in the presence of law officers that indicated his animosity toward Larry Abernathy and his probable involvement in the killing of Scottie.

## II. Competency to Stand Trial

Defendant's first contention is that the district court was clearly erroneous in finding him competent to stand trial. Due process requires that a defendant be tried only if he is competent to assist in his own defense. *Pate v. Robinson*, 383 U.S. 375, 378, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966). In aid of this due process right, Congress

---

2. Because defendant is an Indian and he was charged with committing murder on an Indian reservation, the court had jurisdiction under 18 U.S.C. § 1153. "Murder" is defined in 18 U.S.C. § 1111(a).

enacted 18 U.S.C. § 4244, which provides for a pretrial hearing, upon proper motion, to ascertain the accused's mental capacity to stand trial. The two-prong test applied under section 4244 is whether the accused "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960).

The district court held a section 4244 competency hearing on August 27, 1979, about sixteen weeks before trial. Upon review of written reports and testimony of four witnesses, including two psychiatrists, the court found defendant competent. The court denied defendant's motion for a second competency hearing ten days before trial. This motion apparently rested on psychiatric reports filed after the court's initial determination of competency. Defendant also sought a competency hearing during the trial. This motion was also denied.

■ The court's determination of competency is a factual finding which must be affirmed unless clearly arbitrary or unwarranted, *United States v. Maret*, 433 F.2d 1064, 1067 (8th Cir. 1970), *cert. denied*, 402 U.S. 989, 91 S.Ct. 1678, 29 L.Ed.2d 155 (1971), *Feguer v. United States*, 302 F.2d 214, 236 (8th Cir.), *cert. denied*, 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962), or clearly erroneous. *Butler v. United States*, 384 F.2d 522, 523 (8th Cir. 1967), *cert. denied*, 391 U.S. 952, 88 S.Ct. 1854, 20 L.Ed.2d 865 (1968). *Cf. United States v. Aponte*, 591 F.2d 1247, 1249 (9th Cir. 1978) (clearly erroneous standard of review); *United States v. Hayes*, 589 F.2d 811, 822 (5th Cir.), *cert. denied*, 444 U.S. 87, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979) (clearly arbitrary or unwarranted standard of review); *United States v. Caldwell*, 543 F.2d 1333 (D.C.Cir. 1974), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) (clearly arbitrary or erroneous standard of review). If the initial determination of competency is not clearly unwarranted, refusal to hold a

second hearing must also be affirmed unless the court abused its discretion in light of new evidence and the length of time elapsed from the prior determination. *United States v. Cook*, 418 F.2d 321, 324 (9th Cir. 1969). *See generally Drope v. Missouri*, 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975) ("defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence * * * are all relevant in determining whether further inquiry is required").

Some of the evidence introduced at the August 27 hearing tends to support the view that defendant was not competent to stand trial. This evidence showed that defendant, age 21, had a history of epileptic seizures and behavioral disorders stemming from his early childhood. He dropped out of school in the fifth grade. His Intelligence Quotient (IQ) was rated "dull normal," in the bottom fifteen percent of the population. The experts agreed defendant suffered from some mild degree of brain damage. One witness, psychologist Dr. Mary Curran, testified defendant had "poor verbal skills" and made "idiosyncratic use of language." She doubted defendant could provide counsel with an integrated version of his activities at the time of the offense. Supporting this assessment was psychiatrist Dr. Daryl Stephenson, who testified that defendant had "a very childish immature kind of appreciation of [the charges made against him]" and would not be able to give a full and accurate report of events to his attorney.

■ Other evidence, however, supported the contrary view—that defendant was capable of understanding the proceedings and communicating with his counsel. The district court evaluated this evidence in its August 30 opinion:

[Psychiatrist Dr. David Bean] stated that he found that defendant understands that he had been charged with the killing of the victim, and that he comprehends that if he is found guilty, he will go to jail. Further, Dr. Bean testified that defendant has a detailed memory of many

of the events in question. The fact defendant sometimes gives incorrect answers to some questions Dr. Bean ascribes to the fact defendant has gotten incorrect information, and not because defendant is mentally unable to give the correct answer.

Dr. Bean testified that while an attorney may have an initial problem in understanding defendant, this is because defendant's first contacts with other people cause him to become anxious and confused. As this anxiety reduces, the defendant is capable, in Dr. Bean's view, of coming up with a reasonable factual record with reasonable consistency. Counsel would have to take pains to talk to defendant simply to make sure defendant understands what is being discussed, but Dr. Bean was sure, if this was done, defendant could grasp the implications of his trial, and formulate a defense.

This picture of defendant's mental condition does not seem particularly inconsistent with the views of the other experts, though they may not agree with Dr. Bean's final conclusions. Dr. Carroll Isburg, who conducted the neurological evaluation of defendant but did not testify, reported that defendant "understood commands readily and cooperated without any problems." As noted before, Dr. Curran also found that defendant was cooperative and understood what was asked of him. And Dr. Stephenson indicated that defendant could, with explanation (even though Dr. Stephenson characterized the amount as "excessive"), understand what was going on.

It seems fairly clear that defendant does, in fact, understand that he is in trouble, that this trouble relates to the death of Scottie Abernathy, and that he could be punished for his actions in connection with that death. All reports indicate that defendant has a fairly detailed memory of many of the surrounding circumstances of the killing, and the accounts he is reported as giving seem reasonably consistent from report to report.

Though defendant's slow grasp of many points may present a problem, it does not seem insurmountable. With careful and considered explanation on the part of defense counsel, there seems to be no indication that defendant cannot gain an understanding of the matters before him. He already appears to have a fairly clear recognition of the implications of his current situation.

This Court cannot conclude simply on the basis that defendant may not fully "appreciate" the charge of murder, that he does not understand that he is, in fact, charged with a killing, and that his future life depends on his presenting a defense. Indeed, it is also clear from both Dr. Bean and Dr. Stephenson's reports and testimony that defendant has already concluded that his epilepsy is an excuse, or a defense, to this charge. Thus, this Court has no basis to say that the evidence has shown that defendant lacks a "rational as well as factual understanding" of these proceedings. Though it may well be quite burdensome for counsel to take the pains to simply and plainly explain matters to defendant, there can be no finding of incompetency on this basis alone. The Court recognizes counsel's difficulty and appreciates it, but the presence of some mental illness on defendant's part does not, in this case, make him incompetent to stand trial. *Wheeler v. U.S.*, 404 F.2d 252 (8th Cir. 1968). While it will require a sacrifice on counsel's part, this Court has no doubt that defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of understanding." This Court therefore holds that defendant is competent to stand trial.

We affirm this determination as not clearly arbitrary, unwarranted, or clearly erroneous.

Evidence coming to light after the district court's determination of competency either supported the court's initial determination or was not significantly different in character than that which the district court had already assessed. The written reports of psychiatrist Dr. Charles Lord and psy-

chologist Dr. Brian Lewis concluded, respectively, that defendant had an extremely limited mental capacity to assist counsel, and that defendant wholly lacked that capacity. The report of psychiatrist Dr. Daniel Kennelly, however, concluded that defendant could participate in the legal process if given some basic instructions. Defendant's behavior at trial was consistent with Dr. Kennelly's conclusion. The defendant testified on his own behalf and presented a reasonably coherent account of his activities on the day in question.[3] Neither defendant's testimony nor his other behavior during trial created sufficient doubt as to his mental competence to require further inquiry; the district court did not abuse its discretion, then, in declining to hold a second competency hearing.[4] Cf. *Drope v. Missouri, supra,* 420 U.S. at 178–81, 95 S.Ct. 907–08, (where no competency hearing had originally been held, hearing should have been held where defendant choked wife just prior to trial and attempted suicide during trial).

### III. Admission of Law Officers' Statements

Law enforcement officers John Ellis, Arthur Flynn, Carl Miller, Ben Mahoney, and Gerald Douglas all testified, over defendant's objection, as to inculpatory statements defendant had made in their presence. Defendant contends these statements were taken in violation of his constitutional rights under either the Fifth Amendment, *see Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or the

Sixth Amendment, *see Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). We recount the testimony as to each statement in the chronological order in which the statements were made.

*Ellis.* At the FBI interview on the afternoon of May 20, defendant signed an FBI form expressing his waiver of any right to remain silent or seek legal counsel. He was then questioned for about an hour, with his parents present during most of that time. Defendant told agent Ellis at this time that he was very angry with Larry Abernathy for forcing him to pay for blue jeans that defendant thought he had already bought. Defendant said he had wanted "to bust [Abernathy] right there," but there were too many people in the store. Defendant also told Ellis he did not kill Scottie Abernathy, but could have done so if he had had a seizure.

*Flynn.* Defendant had another FBI interview the next morning. Defendant again signed the FBI waiver form. His parents again were present. Defendant explained to FBI agent Flynn that he had gone to the Howe residence after he had left the Abernathy store. Upon leaving the fifteen minute interview, defendant commented that "if they all start lying about me, I'm going to beat up on the Howes, too."

*Miller.* When arrested that afternoon, defendant was driven from Fort Thompson to the Hughes County Jail in Pierre, South

---

**3.** Defendant explained that his argument with the Abernathys about being short-changed and about having to pay for clothes he had already purchased brought on an epileptic seizure which he suffered after he left the store. Defendant testified he regained consciousness at the Howe residence and noticed he had a nose bleed (which would explain the spot of blood on his shirt). He said he returned toward the Abernathy store in search of the clothes he had purchased. Defendant further related that upon reaching the vicinity of the store he was approached by police who told him they had fingerprint evidence that he had killed Scottie Abernathy. Defendant claimed to have no memory of killing Scottie Abernathy and indicated that any knowledge he purported to have of the killing was planted in his mind by police.

**4.** The court did interrupt trial to determine whether defendant was *physically* competent to proceed when it appeared that defendant was having apparent epileptic seizures during trial (although not in court). The court relied on a physician's report to conclude that defendant was able to continue.

At a later point in trial, the court was apprised that defendant had torn his shirt and was throwing his boots and water at federal marshals, in an apparent reaction to what defendant considered to be inaccurate testimony. The court summoned defendant to chambers and gained his assurance that he would continue his good behavior in the courtroom.

Dakota, by Fort Thompson police officer Miller. As defendant left the car in Pierre, officer Miller noticed he appeared upset and sought to assure him by telling him that everything would be all right. Defendant responded, "Leave me alone or I'll kill you, too."

*Mahoney.* About one week later, defendant was driven by U.S. deputy marshal Mahoney from the Hughes County Jail to a federal courthouse so that defendant could make an appearance. During the trip defendant responded to a radio news item about food stamp fraud by saying "they asked me why I did what I did. Abernathy has been ripping them off for years."

*Douglas.* Defendant made his last series of inculpatory statements while being driven by deputy U.S. marshal Douglas to and from psychiatric examinations. On August 24, 1979, after mentioning a mathematical problem he had been working on, defendant asked Douglas if the FBI had found out about "the six lies" Larry Abernathy had told about the defendant. Douglas said he did not know. Shortly thereafter, defendant looked out the window of the car, and changed the subject again, saying "I guess I did it, I could have done it but I didn't mean to." On September 21, 1979, Douglas asked defendant why he was not taking his epilepsy medication. Defendant explained that the medication was responsible for his accidents, such as when "I killed Scottie, it was an accident, this medication makes me get in all this mischief." On neither occasion had Douglas asked defendant about the killing of Scottie Abernathy.

The district court ruled each of the above statements was admissible. We find it convenient to consider first the statements made to Miller, Mahoney, and Douglas.

The Supreme Court established standards for the admissibility of a defendant's statements in *Miranda v. Arizona, supra.* The *Miranda* Court held "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial inter-

rogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the [Fifth Amendment] privilege against self-incrimination." 384 U.S. at 444, 86 S.Ct. at 1612. The Supreme Court explored the meaning of "interrogation" for purposes of *Miranda* in *Rhode Island v. Innis,* —— U.S. ——, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The accused in *Innis* was arrested in connection with a crime that involved the use of a shotgun, which police were unable to locate. When the arresting officers apprised the accused of his *Miranda* rights he chose not to talk and asked for an attorney. Enroute to the police station, however, the accused chose to reveal the location of the shotgun when he overhead officers express their concern that a handicapped child from a nearby school might find the gun and hurt himself. The Court held that the admissibility of the shotgun and testimony related to its discovery was consistent with defendant's *Miranda* rights, on the basis that defendant had not been "interrogated."[5] The test for interrogation was whether the suspect was "subjected by police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him." —— U.S. at ——, 100 S.Ct. at 1691. The Court distinguished the officers' "few off-hand remarks" from a "lengthy harangue in the presence of the subject." *Id.*

Applying *Miranda* and *Innis* to the facts of the present case, we conclude defendant's incriminating statements in the presence of law officers Miller, Mahoney, and Douglas did not stem from custodial "interrogation." This is especially true with respect to Miller and Mahoney. Miller's expression of concern about defendant's apparent anxiety had only a remote connection with the crime of which defendant was accused; and Mahoney did no more than record defendant's spontaneous response to the content of a radio news item over which Mahoney had no control. Depu-

---

**5.** The Court therefore did not reach the question of whether defendant had waived his *Miranda* right to be free of interrogation until counsel was present. —— U.S. at —— n.2, 100 S.Ct. at 1688 n.2.

ty marshal Douglas, by contrast, engaged in several protracted conversations with defendant; but the record nowhere indicates that Douglas' remarks on the two occasions in question had the motive or likely effect of interrogation. It was defendant, not Douglas, who adverted to the subject of Larry Abernathy and the killing. Douglas' verbal conduct more resembled the "off-hand remarks" the *Innis* Court condoned than the "lengthy harangue" the Court censured. Defendant points out that Douglas kept a careful log of defendant's incriminating statements. While perhaps this fact is logically probative of an intent to interrogate, it cannot alone be decisive, for a law officer would be derelict in his duty not to log an accused's incriminating statements, whether spontaneous or not. As to law officers Mahoney, Miller, and Douglas, then, the record on the whole satisfies us there was no interrogation under *Innis*, and thus no violation of defendant's rights under *Miranda*.

Nor, for the reasons just expressed, can it be said that defendant's statements were "deliberately elicited" in the absence of counsel in violation of his rights under the Sixth Amendment.[6] *Cf. Brewer v. Williams, supra*, (police officer deliberately played on defendant's religious beliefs by stating missing victim deserved a "Christian burial").

■ The statements made to FBI agents Ellis and Flynn are of a different sort, for they stemmed from interrogation. The agents testified, however, that defendant was not under arrest at the time, that he was accompanied by his parents, that he spoke only after executing a formal waiver of any right to remain silent, and that he was permitted to leave the police station after the interview. Defendant argues that his *Miranda* rights were violated and that any waiver was not effective. Assuming

arguendo that the interrogation was custodial, and thus brought defendant's constitutional rights into play, *cf. Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (*Miranda* applies only when defendant "in custody"), we hold defendant effectively waived any rights he had.

The *Miranda* Court stated:

> If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

384 U.S. at 475, 86 S.Ct. at 1628. The question whether defendant has waived his *Miranda* rights is one that must be determined on "the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

Defendant, although having a "dull-normal" IQ, was not mentally retarded. He had a fifth grade education and could read, write, and do math problems and crossword puzzles. When examined by doctors before trial he was responsive and followed directions. Prior to the May 20 interview, agent Ellis spent five minutes reading and explaining the FBI waiver-of-rights form to defendant, who followed along on his own copy. Agent Flynn read the same form prior to the May 21 interview. Neither agent made threat or promise to induce defendant to speak. To both agents defendant indicated both orally and in writing that he understood and was waiving his rights. On at least two other occasions during this general period defendant assert-

---

6. Statements may be taken in violation of the defendant's Sixth Amendment right to counsel even absent "interrogation." *Rhode Island v. Innis*, —— U.S. ——, ——–——, n.4, 100 S.Ct. 1682, 1689, n.4 (1980). Here, however, the inquiries whether the police interrogated defendant under *Innis* or deliberately elicited information under *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), draw upon the same facts.

ed his right to remain silent.[7] These circumstances convince us that defendant knowingly and effectively waived any constitutional right to silence he may have had.

### IV. Sufficiency of the Evidence

■ The verdict of the jury must be sustained if the evidence, viewed in the government's favor, will permit a jury reasonably to infer guilt. *See Glasser v. United States, supra,* 315 U.S. at 80, 62 S.Ct. at 469. We review the evidence supporting the jury's two basic findings: (a) that defendant killed Scottie Abernathy and (b) that defendant was legally responsible for his conduct when he did so.

#### A. *Evidence that Defendant Committed the Killing*

Defendant notes that absent his statements to law officers, the evidence he killed Scottie Abernathy consists only of (1) circumstantial evidence as to time, opportunity, and motive, and (2) the statement he made to his brother-in-law Quinton McGhee. The defendant would have us dismiss the circumstantial evidence as unpersuasive and his statement to McGhee as planted in defendant's mind by police interrogation.[8]

■ Our holding that the officers' testimony was admissible disposes of defendant's argument. "An admission by the accused identifying himself as the person involved in the [crime] is sufficient to sustain a guilty verdict when the crime itself is shown by independent evidence." *United States v. Opdahl,* 610 F.2d 490, 494 (8th Cir. 1979), *cert. denied,* 444 U.S. 1091, 100 S.Ct. 1056, 62 L.Ed.2d 780 (1980). Moreover, we conclude that defendant's confession to his brother-in-law Quinton McGhee bore substantial indicia of reliability in that it de-

scribed details not brought up by police interrogators. Specifically, the confession revealed that defendant had "split [Scottie's] head open with a baseball bat," that "there must have been a gallon of blood on the couch," and that defendant "threw the bat behind the couch." Scottie Abernathy was killed with a baseball bat, a copious quantity of blood was on the couch, and the bat was found upon an ottoman or what was described as a footstool. This statement and the record as a whole provided persuasive evidence that defendant committed the killing.

#### B. *Evidence of Defendant's Sanity*

The sufficient evidence that defendant killed Scottie Abernathy leads us to consider defendant's next contention—that there was insufficient evidence of his legal responsibility for his conduct. In *United States v. Frazier,* 458 F.2d 911, 918 (8th Cir. 1972), we adopted the ALI test as the rule to be followed in determining the accused's sanity at the time of the alleged offense.

(1) A defendant is insane * * * if, at the time of the alleged criminal conduct, as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

(2) As used in this Article, the terms "mental disease or defect" do not include any abnormality manifested only by repeated criminal or otherwise anti-social conduct.

*Id.* (footnote omitted). The district court instructed the jury in accord with the above test.

The defendant's insanity defense can be characterized as proceeding on three alter-

---

7. When approached by police officer Lytle on the afternoon of May 20, defendant indicated he did not wish to speak and asked for his "counselor." The court found this was a request for social worker Robert Mills and not a request for legal counsel. The incident nevertheless shows that defendant knew how to remain silent when he wanted to. On a subsequent occasion, defendant refused to cooperate with a government psychologist because he

thought cooperation would be detrimental to his interests.

8. Defendant and his parents testified that law officers falsely told defendant that his fingerprints were found on the bat and around the room in which Scottie Abernathy was killed. Each of the relevant officers, however, testified he had not made this false statement to the defendant.

nate theories. The first is that defendant's organic brain damage syndrome deprived him of the capacity to appreciate the wrongfulness of his conduct; the second is that the killing occurred during the postictal stage of an epileptic seizure, when defendant was not conscious of his behavior; and the third is that the killing occurred during a rage attack that a person with defendant's mental condition could not control and thus he lacked the capacity to conform his conduct to the requirements of the law.

Defendant was examined before trial by four psychiatrists (Drs. David Bean, Charles Lord, Daryl Stephenson, and Daniel Kennelly), three psychologists (Drs. Brian Lewis, Mary Curran, and Ronald Jorgenson), and two neurologists (Drs. Kenneth Koob and Carroll Isburg). All but neurologist Dr. Isburg testified at trial to offer their opinions concerning defendant's mental capacity at the time of the killing. We review those opinions and related evidence with respect to each of the three aspects of defendant's insanity defense.

## 1. Diminished Capacity to Appreciate Wrongfulness of Conduct

The defense called as witnesses the psychologists Drs. Lewis and Curran and the psychiatrists Drs. Bean, Lord, and Stephenson. Relying primarily on psychological testing and interviews with the defendant, these witnesses testified, in substance, that defendant had a "chronic organic brain syndrome" (long term brain damage), which diminished his mental capacity to the extent that he could not judge right from wrong. Dr. Curran, for instance, testified that defendant never "really understood" that murder was wrong, and Dr. Lewis testified the defendant had a "very very immature" conception of right and wrong.

On cross-examination of the defense witnesses, however, it was elicited that many persons with organic brain syndromes and with defendant's IQ can distinguish right and wrong, and that defendant felt cheated or unfairly treated by Larry Abernathy. It was further elicited that defendant threatened to expose Larry Abernathy as being unfair to Indians, and that defendant may have evinced an awareness of right and wrong when he offered to pay for the jeans he had concealed under his clothes.

The government produced three expert witnesses in rebuttal, among them the psychiatrist Dr. Kennelly. Dr. Kennelly based his evaluation on about six hours of psychiatric interviews and on reports prepared by Drs. Bean, Stephenson, and Curran. Dr. Kennelly testified that defendant, when asked whether killing another person was wrong, replied that it was. Defendant also told Dr. Kennelly that Larry Abernathy had been unfair to defendant and to others and had lied about defendant. In response to a hypothetical question, Dr. Kennelly opined that a person who offered to pay for jeans that he had been caught shoplifting and who got angry when he thought he was being cheated was capable of telling right from wrong.[9] Dr. Kennelly testified that defendant's mental retardation was not severe or even moderate but only mild or borderline. Finally, Dr. Kennelly testified, as did every other expert, that defendant was non-psychotic—not suffering from delusions or hallucinations or otherwise out of touch with reality. Like other experts, however, Dr. Kennelly did not dismiss the possibility of transient psychotic episodes.

## 2. Seizure-Related Killing

Another aspect of defendant's insanity defense was that the killing of Scottie Abernathy may have been performed unconsciously while defendant was in the latter stage of an epileptic seizure. The experts agreed that defendant had regularly suffered epileptic seizures, the events of which he could not remember. These seizures would begin with a convulsive stage, which

---

**9.** In response to a similar hypothetical question, neurologist Dr. Koob, who had also examined defendant, testified that such a person would have had the capacity to know the wrongfulness of his act, and would have been able to conform his conduct to the requirements of the law.

would last three to ten minutes. During this stage the defendant would be virtually immobile and incapable of directed conduct. During a subsequent, "postictal" stage, however, defendant would often perform complex activities. Of these activities, like those of the convulsive stage, defendant had no apparent consciousness. He could describe them only because others told him what he had done. This phenomenon of unconscious postictal activity some witnesses labeled "psychomotor epilepsy." The testimony of expert and lay witnesses reveal the defendant had a long history of apparent psychomotor episodes. These episodes included turning off the cold water in a shower, walking out into the snow, walking along the river bank, jumping out of a window, climbing a piano, handing out money, playing with imaginary string, and playing with an imaginary fishing pole.

In none of these instances, significantly, did defendant direct violence toward another person.[10] Indeed, two of the government's expert witnesses—psychiatrist Dr. Kennelly and neurologist Dr. Koob—testified that in a psychomotor epileptic state a person could perform only stereotypic or automatic movements, not directed acts of violence such as beating someone with a baseball bat. To the same effect was the opinion of Dr. Isburg, the only other neurologist to examine defendant.[11] Two defense expert witnesses—psychologist Drs. Lewis and Curran—stated they would defer to a neurologist's opinion that directed violence was inconsistent with the postical stage of an epileptic seizure. Another defense witness, psychiatrist Dr. Bean, stated that a person could commit a "directed act of violence" during seizure activity. But he acknowledged that planned, organized behavior, such as ambushing a person with a baseball bat, would be inconsistent with seizure phenomena. Only defense witness psychiatrist Dr. Lord, who acknowledged

that he was not yet board certified, was willing to say that repeated flailing with a baseball bat could be consistent with the non-directed behavior of a postical stage, and that he would disagree with the contrary conclusion of a neurologist.

### 3. Uncontrollable Rage Attacks

Defendant's third insanity theory was that defendant's organic brain syndrome prevented him from controlling rage attacks that an ordinary person could control. The principal proponent of this theory was defense psychiatrist Dr. Bean who apparently relied on defendant's previous anger-related assaults against family members, see note 10 supra. Dr. Bean acknowledged, however, that his theory was "highly conjectural" and that he could be "all wet." Dr. Bean also acknowledged the possibility that defendant was aware of the wrongfulness of his behavior at the time of the killing. In rebuttal, prosecution psychiatrist Dr. Kennelly spoke to the same point, contrasting uncontrollable anger with uncontrolled anger. He opined that anger is uncontrollable only for those who are "very grossly psychotic" or "severely mentally retarded" and that defendant fit into neither category. There was also evidence that defendant, although angry enough at Larry Abernathy to want to assault him in the Abernathy store, controlled his rage and left the store peaceably.

■ "A criminal defendant is presumed sane, but the introduction of evidence of insanity dispels the presumption and subjects the prosecution to the burden of proving sanity beyond a reasonable doubt." *United States v. Dresser*, 542 F.2d 737, 742 (8th Cir. 1976). To reverse the conviction we must be satisfied that the prosecution's evidence was so weak that a reasonable juror would necessarily possess a reasonable

10. There was evidence of two episodes in which defendant attacked members of his family, and defendant threw his boots and cups of water at federal marshals in a jail cell incident during trial, see note 4 supra. In none of these instances, however, was there corroborated evidence that defendant had had a seizure. In all

three instances the defendant indicated he was angry.

11. Dr. Isburg's opinion was elicited from psychiatrist Dr. Stephenson, who examined Dr. Isburg's report.

doubt as to defendant's sanity. *Dusky v. United States*, 295 F.2d 743, 756 (8th Cir. 1961), *cert. denied*, 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed.2d 536 (1962).

Although five of the nine experts who examined the defendant testified he may·not have been or was not sane at the time of the killing, we conclude the contrary expert testimony and the reasonable inferences the jury could draw from other evidence justified the submission of the sanity issue to the jury. This is not a case in which reasonable jurors must necessarily harbor a reasonable doubt as to defendant's sanity. On the basis of the evidence before it the jury could find the defendant had the mental capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. The theory that the killing occurred as a result of seizure was strongly rebutted, and although the evidence showed defendant had had fits of rage, there was also evidence that defendant could control his rage. There was only conjectural evidence—the theory of Dr. Bean, which was disputed by Dr. Kennelly—that defendant's mental condition made some rage attacks uncontrollable.

After careful consideration of the entire record we are satisfied there was sufficient evidence to support the jury finding that defendant was sane at the time he committed the offense charged.

Affirmed.