UNITED STATES of America, Appellee,

v.

Michael Keith SAMUELS, Appellant.

No. 85–2002.

United States Court of Appeals,
Eighth Circuit.

Submitted March 13, 1986.

Decided Sept. 24, 1986.

---

Sylvester James, Jr., Kansas City, Mo., for appellant.

J. Whitfield Moody, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before McMILLIAN and BOWMAN, Circuit Judges, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

Samuels appeals from the district court's judgment of conviction sentencing him to serve five years for his violation of 18 U.S.C. § 871(a), charging that he mailed a letter threatening to take the life of or inflict bodily injury on the President of the United States. Samuels contends that there was insufficient evidence of his sanity at the time of the offense to support the jury's verdict. Furthermore, he claims that the government's psychiatric witness should not have been allowed to state the test for insanity because this amounted to a statement of opinion as to criminal responsibility in violation of Rule 704(b) of the Federal Rules of Evidence. Samuels also contends that the trial court's retroactive application of the Insanity Defense Reform Act of 1984 violated the ex post facto clause of the Constitution. We reverse the decision of the district court as to sufficiency of the evidence.

## I. BACKGROUND

On January 13, 1984 the White House mailroom received a letter signed by Samuels. The letter was dated January 10, 1984 and addressed to: "Ronald Regan [sic], the President of the Land you took from the Indians, Washington, D.C. Washington." The letter read:

> To Ronald Regan and all other honkies that was President & cabinet members. I dont and is not going to talk with ya and ya better quit fucking with me. I'm not going to help ya brainwash our people and any others. Keep fucking with me and ya will be dead and buried six feet deept. I will kill ya myself. Keep fucking with me. Michael Keith Sam-

---

* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

uels. Also the honkies in any kind of uniforms, plain clothes or no clothes.

The letter was relayed by the Intelligence Division of the United States Secret Service, located in Washington, D.C., to Special Agent James P. O'Connor in the Kansas City office of the Secret Service. During the interrogation of Samuels in the Secret Service office, he admitted writing the letter and then stated "[a]nd I don't want to talk about it anymore." At that point the interview stopped and he was detained in custody.

Samuels was indicted on April 19, 1984 for violation of 18 U.S.C. § 871(a). Samuels plead not guilty to the charges against him and was committed to the United States Medical Center for Federal Prisoners at Springfield, Missouri ("MCFP") for an initial 60–day observation period to determine his competency to stand trial. On April 30, 1984, Dr. James Leach, a psychiatrist at MCFP, appeared at a competency hearing before the district court and testified that Samuels was competent to stand trial. The court, however, expressed concern that the appellant's competency had been attained only through the use of Thorazine and remitted him back to MCFP for further testing to determine if his competency could be maintained without the use of drugs.

On January 15, 1985 a second competency hearing was held at which Dr. Leach testified that Samuels was not competent to stand trial because his frequent attacks on medical personnel and other patients rendered him a threat to himself and others. Dr. Leach did indicate to the court that within an additional 2–4 month period, if Samuels remained on a program of medication, he would probably stabilize and become competent to understand the nature of the charges against him and assist in his defense. The court accepted Dr. Leach's opinion and ordered the additional 4–month period.

After the hearing on January 15, 1985 until the trial on May 28, 1985 Samuels remained in MCFP under the care of Dr. Harry S. Darling. After treating Samuels with the medication Navane, Dr. Darling testified before the district court that Samuels was competent to stand trial while on medication, but that he would not be competent without medication. After the court found Samuels competent to stand trial while on medication, the trial was held. The jury thereafter returned a verdict of "guilty" against the defendant. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Samuels raised the defense of insanity at trial and asserts now on appeal that the trial court should have found that the evidence was insufficient to support a finding that he was sane at the time he wrote and mailed the letter to the President. The American Law Institute test for insanity was adopted by this court in *United States v. Frazier*, 458 F.2d 911, 918 (8th Cir.1972), and states that a defendant is insane if at the time of the alleged crime "he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." (Footnote omitted.)[1] A defendant is presumed to be sane until he introduces evidence of insanity, at which point the burden shifts to the government to prove sanity beyond a reasonable doubt. *United States v. Voice*, 627 F.2d 138, 148

1. The federal insanity defense was revised by the "Insanity Defense Reform Act of 1984," chapter IV of Title II of the "Comprehensive Crime Control Act of 1984." Because Samuels wrote and mailed the letter to the President before the statute became effective, the ex post facto clause would preclude application of the substantive changes in the Act to this case. *See United States v. Teller*, 762 F.2d 569, 576 n. 4 (7th Cir.1985); *United States v. Prickett*, 604 F.Supp. 407, 410–11 (S.D.Ohio 1985); *United States v. Kowal*, 596 F.Supp. 375, 377 (D.Conn. 1984). However, those portions of the Act which are purely procedural, such as Federal Rule of Evidence 704(b), are applicable to this case. *See Prickett*, 604 F.Supp. at 410–11; *United States v. Lakey*, 610 F.Supp. 210, 213 n. 4 (D.Tex. 1985). *See also* Handbook on the Comprehensive Crime Control Act of 1984 and Other Criminal Statutes Enacted by the 98th Congress 65 (1984).

(8th Cir.1980). To reverse a conviction "we must be satisfied that the prosecution's evidence was so weak that the reasonable juror would necessarily possess a reasonable doubt as to defendant's sanity." *Id.* at 148–49. Reviewing this case in the light most favorable to the United States, we find that the government produced insufficient evidence from which the jury could reasonably find Samuels was sane at the time he wrote and then mailed the threatening letter to the President.

 Samuels clearly met his initial burden of producing evidence to overcome the presumption of sanity. He produced evidence from his brother, Alonzo Samuels, that his behavior had deteriorated from September of 1983 to January of 1984. Samuels also presented evidence from his long-time community worker, Eleanor Klein, that when he was taking his medication his assaultive and threatening behavior would become stabilized.[2] She also testified that in the months preceding his arrest on January 30, 1984 she had noticed that he had not been taking his medication. Furthermore, these witnesses testified as to his long history of prior hospitalizations and treatment for his mental problems. Samuels had a history of episodic illness which followed the pattern of events which occurred in the months prior to his arrest. Typically, after he had been hospitalized and had taken medication long enough to stabilize his behavior and thought processes, he would become happier and hopeful of finding a steady job. However, when he was unable to find work he would begin to withdraw and stop taking his medication. At this point, Samuels would become hostile and exhibit paranoid schizophrenic behavior.

During the months immediately preceding his arrest, Samuels had become deeply depressed. In December of 1983 he refused to allow other family members to decorate the Christmas tree in their home and took ornaments off after others had

put them on. He turned the television set to the wall so that no one could see the screen because people on television were attempting to force him to spy on Russia. He moved his mother and all their household effects into a vacant house across the street from his home. The police evicted them. Within a few days, he returned his mother and furnishings to the vacant house and had to be evicted again.

Samuels also wrote numerous letters to the "king of Africa," the U.N., the mafia, the C.I.A., the mayor, the governor, doctors, and social workers. To write his numerous letters, he tore pages out of phone books and used whatever paper he could find. Most of the letters were threatening and belligerent, evidencing his delusional and paranoid thought processes.

On January 13, 1984, the day the letter was received in the White House mailroom, Eleanor Klein and Alonzo Samuels, having decided to readmit him to the Western Missouri Mental Health Clinic (WMMHC), went to his home, only to have him elude them. On January 16, 1984, after having been arrested for threatening a Medicare driver, he was admitted to WMMHC. The admitting physician noted that Samuels seemed to be experiencing "acute exacerbation of a chronic, psychotic process when not properly medicated." He was placed in restraints on that day and later was observed pretending to take pictures of several WMMHC staff members for his "list of people I'm going to kill."

Samuels having met his initial burden of producing sufficient evidence to overcome the presumption of sanity, the government then had the burden of establishing beyond a reasonable doubt that he was sane at the time the offense was committed. *United States v. Malone,* 558 F.2d 435, 437 (8th Cir.1977). We first note that neither of the government's lay witnesses, George Kachur and Dick Counts, could testify about Samuels' state of mind on or about January 10 through 13 when the offense occurred.

---

**2.** We also find persuasive the fact that Samuels had to be medicated in order to be found competent to stand trial. This is suggestive of how 

disturbed he could become when he did not regularly take his medication.

In addition, the government presented the testimony of Dr. Clayton Pettipiece, who testified with regard to the examinations he conducted beginning August 7 or 8, 1984 to determine Samuels' mental state some eight months earlier. Dr. Pettipiece testified that he reviewed previous medical and pre-sentencing reports and read evaluations made during Samuels' previous admissions to MCFP and then wrote a report in which he concluded that Samuels was a manipulative person who was merely suffering from a personality disorder. Dr. Pettipiece testified that during his initial evaluation Samuels told him he had not been suffering from any delusions at the time. The dissent argues this testimony supports the conclusion that he was sane beyond a reasonable doubt at the time of the incident. We do not believe, however, that Dr. Pettipiece's testimony is sufficient in itself to counter the overwhelming evidence of Samuels' insanity at the time.

Dr. Pettipiece's testimony was based in part on mental health records dated four years before the offense occurred. In fact Dr. Pettipiece had not read any of Samuels' mental records dated later than 1980. He admitted that the records of Samuels' January 16, 1984 admission to WMMHC might have had an effect on his evaluation. Moreover, Dr. Pettipiece diagnosed Samuels as suffering from paranoid schizophrenia, describing it as

> something once you have it, it continues on and comes and goes. * * * I know it comes again because subsequently since he was in the hospital on a third admission, then he was acutely psychotic and he was acting differently.

IV Trial Transcript, p. 11. Against his own diagnosis and that of every doctor who had treated Samuels for the previous eight years, Dr. Pettipiece concluded that Samuels was sane at the time of the offense.

The cornerstone for Dr. Pettipiece's opinion is a statement made by Samuels during his initial evaluation in August, 1984, more than seven months after the charged event. We do not believe the subjective statement of Samuels, whom Pettipiece described as "manipulative," is sufficient in itself to prove beyond a reasonable doubt that Samuels was legally sane. To the contrary, the defendant's substantial evidence from witnesses who were able to testify as to his condition at or near the time of the offense would more than adequately rebut the opinion of Dr. Pettipiece, whose evaluation was devoid of any objective information of Samuels' condition and mental history during the relevant time period.

The government argues that it proved that Samuels was mean and manipulative, and therefore had a personality disorder, through its cross-examination of the appellant's witnesses. As we stated earlier, however, these witnesses' testimony provided substantial evidence that at the time of the offense Samuels demonstrated paranoid schizophrenic behavior characteristic of one who is lacking in the substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. We therefore do not believe that the government's evidence was sufficient to prove beyond a reasonable doubt that he was legally sane at the time of the offense.[3]

■ Normally this Court defers to the sound judgment of the jury when the district court has properly submitted the case. Only in those rare cases when the evidence is so strong that rational factfinders would conclude there was insufficient evidence of the defendant's guilt beyond a reasonable doubt do we intrude upon the domain of the jury. In reviewing the sufficiency of the evidence, we may not judge the credibility of the evidence; however, we must inevitably determine the weight that should be accorded to the evidence. *See Speigner v. Jago,* 603 F.2d 1208, 1212 (6th Cir.1979). In this case we believe the great weight of the evidence compels us, in order to avoid a

---

3. Because our decision as to the sufficiency of the evidence is dispositive of the case, we do not reach the appellant's remaining claims.

manifest injustice, to invade the jury's domain.

As did the district court, we have a grave concern with allowing such an obviously disturbed man to be acquitted for this crime. In a society such as ours, however, where human dignity is of value, there have to be and there are methods other than the criminal process to handle this kind of situation. Were this case before the Court under the substantive changes wrought by the Insanity Defense Reform Act of 1984, we have no doubt that 18 U.S.C. § 4243, providing for commitment of defendants found "not guilty only by reason of insanity," would have given the district court an avenue on which to proceed. Although the federal law in effect at the time of the offense allows no other result than acquittal, we must note that, if the authorities conclude that Samuels remains a serious threat to society, we believe Missouri law would provide a proper course on which to initiate commitment proceedings.

We must conclude that, in all judicial fairness, there was insufficient evidence from which reasonable persons could conclude beyond a reasonable doubt that the government had proven Samuels' sanity at the time of the offense. We therefore reverse the decision of the district court and remand for proceedings in accord with our decision.

BOWMAN, Circuit Judge, dissenting.

I respectfully dissent. Having reviewed the record of the trial in this case, I am satisfied the jury's verdict is supported by sufficient evidence that Samuels was sane when he committed this offense. Samuels's witnesses and the government's chief witness, Dr. Pettipiece, offered conflicting views on the issue of Samuels's mental state. The jury was entitled to credit Dr. Pettipiece's opinion, and it did so. In today's decision the Court, without benefit of having seen or heard any of the witnesses, simply substitutes its appraisal of their testimony for the jury's appraisal, and thus usurps the function of the jury. Particularly regrettable is the fact that the Court's opinion brushes aside Dr. Pettipiece's uncontradicted testimony that Samuels told him during their initial interview that he was not having one of his periodic "spells" at the time he wrote his threatening letter to the President. Here is what Dr. Pettipiece said in response to a question on direct examination:

> At [the time of the initial interview] his paranoid schizophrenia was in remission. He was not having delusions. And in fact when he talked to us in his initial evaluation, he told me that at the time that this had happened—I asked him specifically if he was hearing voices or if he was paranoid or if he was sick at the time. And he told me that he was not having delusions at the time this happened, that he knows when these spells that he has are coming on. He gets headaches and he gets nervous and anxious and he can tell when they are coming on. And he was not having it during the time that this letter was written.

IV Trial Transcript, pp. 10–11. I believe it is clear that this unrebutted testimony in and of itself amply supports the jury's verdict. Other testimony, which for the sake of brevity I shall not recount here, provides still further support for the verdict. Accordingly, I cannot agree that the government produced insufficient evidence from which the jury reasonably could find that Samuels was sane at the time he committed the offense of which he has been found guilty.

Finding no merit in Samuels's other arguments, I would affirm his conviction.