**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 27 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GERARDO VALDEZ,

      Petitioner-Appellant,

v.

RON WARD, Warden, Oklahoma State
Penitentiary; ATTORNEY GENERAL OF
THE STATE OF OKLAHOMA,

      Respondents-Appellees,

No. 99-6147

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-97-347-L)**

---

Robert A. Nance of Riggs, Abney, Neal, Turpen, Orbison & Lewis, Oklahoma
City, Oklahoma, for Petitioner-Appellant

Robert L. Whittaker, Assistant Attorney General (W.A. Drew Edmondson,
Attorney General of Oklahoma, with him on the brief), State of Oklahoma,
Oklahoma City, Oklahoma, for Respondents-Appellees.

---

Before **SEYMOUR**, Chief Judge, **PORFILIO** and **EBEL**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

Petitioner Geraldo Valdez was convicted of first degree murder and sentenced to death. After he unsuccessfully filed a direct appeal and a petition for state post-conviction relief with the Oklahoma Court of Criminal Appeals (OCCA), he sought a writ of habeas corpus in federal district court under 28 U.S.C. § 2254. The district court denied the writ. Mr. Valdez appeals, and we affirm.

## BACKGROUND

Mr. Valdez is a Mexican immigrant who has lived in Oklahoma for some time. One night in April of 1989, Mr. Valdez met the victim, Juan Barron, at a bar in rural Oklahoma. Mr. Barron was a homosexual who apparently showed a sexual interest in Mr. Valdez. Mr. Valdez, a married heterosexual, rejected Mr. Barron's advances. The testimony at trial revealed that throughout the course of the evening Mr. Valdez consumed approximately fourteen beers.

When the bar closed, Mr. Barron, Mr. Valdez, and his friend, Martin Orduna, went to Mr. Valdez's house. Mr. Valdez began preaching to Mr. Barron out of the Bible, attempting to convince Mr. Barron of the sinfulness of his homosexuality. When Mr. Barron rejected this proselytizing, Mr. Valdez brought out his gun. He began slapping Mr. Barron, telling him he was going to kill him and that according to the Bible homosexuals do not deserve to live. Ordering Mr. Barron to remove his clothes, Mr. Valdez gave him the option of death or

-2-

castration, and continued to hit and slap him. When Mr. Barron started to fight back, Mr. Valdez shot him twice in the forehead and then hit him in the head with the gun. While Mr. Barron lay on the couch, Mr. Valdez retrieved a knife and cut his throat, finally killing him. Mr. Valdez threatened to kill Mr. Orduna if he told anyone about the murder, and demanded Mr. Orduna's assistance in disposing of the body. The two men carried Mr. Barron, the couch, and the surrounding rug to the backyard, where they set them on fire.

Three months later, the police began investigating Mr. Barron's disappearance. On July 25, officers executed a search warrant for Mr. Valdez's home. Upon entering the house, Deputy Terry Cunningham administered *Miranda* warnings to Mr. Valdez in English. Mr. Valdez conversed in English with the officers, who believed he understood his rights. Because the officers had already questioned Mr. Orduna, they knew to look for Mr. Barron's remains in the backyard barbecue pit. There they found what appeared to be a bone fragment.

Mr. Valdez agreed to accompany the officers to the local police station. Officer Dan Benson administered another *Miranda* warning to Mr. Valdez upon their arrival. Throughout the interrogation, Mr. Valdez spoke in English, without the aid of an interpreter, and denied any involvement in Mr. Barron's death. The officers escorted Mr. Valdez back to his home late that evening. While driving back, Deputy Cunningham told Mr. Valdez that he would feel better if he told

them the truth. Officer Dan Benson asked Mr. Valdez if he would show them what he had done with the body. When they arrived at Mr. Valdez's home, he showed them where he had burned Mr. Barron's body. Deputy Cunningham read Mr. Valdez his *Miranda* warnings a third time and asked him if he understood his rights. Mr. Valdez said he did. When Deputy Cunningham asked Mr. Valdez to sign the waiver of rights form, which was written in English, Mr. Valdez asked to read it first. Mr. Valdez then signed the waiver and confessed to killing Mr. Barron. This confession was taped and played for the jury.

Mr. Valdez was arraigned the morning of July 26 and counsel was appointed for him. Later that day while Mr. Valdez was still in custody, Special Agent A. J. Irwin of the U.S. Immigration and Naturalization Service interviewed Mr. Valdez without his counsel present. Agent Irwin had previously interviewed Mr. Orduna and Alfonso Borjas, a friend of Mr. Valdez who was present at the bar on the evening of the murder, in an effort to aid the state police in their investigation. As with these other interviews, Agent Irwin's interview with Mr. Valdez was conducted entirely in Spanish. At the outset, Agent Irwin identified himself and emphasized he was only there to establish Mr. Valdez's alienage and immigration status. He then administered the *Miranda* warnings to Mr. Valdez in Spanish.

After describing his immigration status to Agent Irwin, Mr. Valdez stated

-4-

"that he wanted to converse with a Spanish speaking law enforcement official concerning the matter for which he was incarcerated." Rec., Supp. Ex. 2, Report by Agent A.J. Irwin at 10. Agent Irwin told Mr. Valdez he did not have to offer information about the homicide and said he was satisfied with Mr. Valdez's immigration status. Mr. Valdez still insisted on telling his story and proceeded to explain what happened on the night he killed Mr. Barron.

At trial, Mr. Valdez admitted the crime and the events leading up to it, but he asserted an insanity defense based on what his appellate counsel describes as his "religious delusions." Mr. Valdez testified that he believes homosexuality is a sin according to the Bible and he wanted to help Mr. Barron understand the error of his ways. He testified he became angry and killed Mr. Barron after he refused to listen to the Bible's message. He also testified he might kill another person if placed in the same situation. Agent Irwin testified that Mr. Valdez told him on July 26 "he was not insane and he did not intend to use an insanity plea or defense." Rec., vol. IV at 73. Agent Irwin also testified that Mr. Valdez showed no remorse for killing Mr. Barron.

After hearing the evidence, the jury convicted Mr. Valdez of first degree murder. Following the sentencing phase of the trial, the jury found three aggravating circumstances: Mr. Valdez posed a continuing threat to society; the crime was especially heinous, atrocious or cruel; and Mr. Valdez created a great

risk of death to more than one person during the commission of the crime. The jury sentenced him to death. The OCCA upheld Mr. Valdez's conviction and sentence on direct appeal and denied post-conviction relief. *See Valdez*, 900 P.2d 363 (Okla. Crim. App. 1995); *Valdez v. State*, 933 P.2d 931 (Okla. Crim. App. 1997). Mr. Valdez thereafter filed for a writ of habeas corpus in federal district court. The district court denied the writ and Mr. Valdez appeals that denial.

On appeal, Mr. Valdez makes six claims of constitutional error: (1) his statements made on July 25 and 26 were obtained in violation of his Fifth Amendment rights; (2) the July 26 interrogation violated his Sixth Amendment right to counsel; (3) the State failed to prove he was sane beyond a reasonable doubt; (4) he was incompetent to stand trial; (5) the trial court's failure to instruct the jury on second degree murder violated his due process rights; and (6) his trial counsel provided ineffective assistance. The district court granted Mr. Valdez a certificate of appealability on all of these issues. *See* 28 U.S.C. § 2253(c).

## STANDARDS OF REVIEW

Mr. Valdez filed the present habeas petition on July 3, 1997. The provisions of section 2254 as they were amended by the Anti-Terrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), therefore apply to our review. Under AEDPA, section 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim

-6-

adjudicated on the merits in state court unless that adjudication:

> (1) . . . was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(1)-(2). Section 2254(e)(1) further requires a habeas court to presume that factual determinations made by the state court are correct, and places the burden on the petitioner to rebut that presumption by clear and convincing evidence. *See* § 2254(e)(1).

The Supreme Court recently construed the review standard set forth in subsection (d)(1). *See Williams v. Taylor*, 120 S. Ct. 1495 (2000). When applying subsection (d)(1), the Court stated the threshold question is whether the petitioner seeks to apply a rule of law that was "clearly established" by the Supreme Court at the time the conviction became final.[1] *See id.* at 1511 (Stevens, J., writing for the Court). If so, we must proceed to a bifurcated inquiry. *See id.* at 1519 (O'Connor, J., writing for the Court) (subsection (d)(1) "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court"). We first determine

---

[1]This clause "refers to the holdings, as opposed to the dicta, of th[e Supreme] Court's decisions as of the time of the relevant state-court decision." *See Williams v. Taylor*, 120 S. Ct. 1495, 1499 (2000) (O'Connor, J., writing for the Court).

whether the state court's decision was contrary to clearly established Federal law. The "contrary to" clause of subsection (d)(1) is fulfilled where the state court applied a rule that was "diametrically different [from], opposite in character or nature, or mutually opposed" to a maxim of law as stated by the Supreme Court. *Id.* The "contrary to" clause is also satisfied where the state court is confronted with a set of facts which are "materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 1519-20.

We next ask whether the state court's determination involved an unreasonable application of clearly established Federal law. *See id.* at 1520. The "unreasonable application" clause of subsection (d)(1) applies in two scenarios: first, where the "state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," *id.*; second, where the "state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," *id.*

In either scenario the reviewing habeas court must determine whether the state court's application of Supreme Court precedent to the case at bar was "reasonable." *See id.* at 1521-22. The Court refrained from defining the term

-8-

"reasonable" as it is used in AEDPA, other than to note that while it is "difficult to define," it is "a common term in the legal world and, accordingly, federal judges are familiar with its meaning." *Id.* at 1522. The Court did instruct that the reasonableness determination is an objective inquiry, not a subjective one. *See id.* at 1521-22. Thus, the fact that one court or even a few courts have applied the precedent in the same manner to close facts does not make the state court decision "reasonable."

Mr. Valdez cites *Miller v. Champion*, 161 F.3d 1249 (10th Cir. 1998), for the proposition that because he did not have an evidentiary hearing in either state or federal district court on his constitutional claims, the underlying factual findings should be reviewed de novo rather than presumed correct. *See id.* at 1254. *Cf. Smith v. Estelle*, 711 F.2d 677, 680-81 (5th Cir. 1983) (state habeas court's failure to hold evidentiary hearing on petitioner's allegation meant that there were no state findings of fact to which the presumption of correctness could apply).

Mr. Valdez's reliance on *Miller* is misplaced. The petitioner there had *requested* and been denied an evidentiary hearing in both state and federal court. In a separate order, the district court here denied Mr. Valdez's request for an evidentiary hearing because he had failed to request one in state court. Rec., vol. I, doc. 43 at 2. As the district court pointed out, under AEDPA a habeas

petitioner is not entitled to an evidentiary hearing in federal court if he "has failed

to develop the factual basis of [the] claim in State court proceedings." *Id.*

Because Mr. Valdez failed to request a hearing from the state court and does not

argue that any of the exceptions listed in section 2254(e)(2) apply,[2] *Miller* does

not apply here and the district court correctly denied Mr. Valdez's request for an

evidentiary hearing. *Cf. Smallwood v. Gibson*, 191 F.3d 1257, 1266 (10th Cir.

1999) (petitioner not entitled to *Miller* exception where factual basis for his claim

could have been, but was not, developed in state court).

We now turn to our review of Mr. Valdez's claims in light of *Williams*, 120

S. Ct. 1495.  In doing so, we review the district court's factual findings under a

clearly erroneous standard and its legal conclusions de novo.  *See Rogers v.*

*Gibson*, 173 F.3d 1278, 1282 (10th Cir. 1999), *cert. denied*, 120 S. Ct. 944

(2000).

---

[2]Section 2254(e)(2) provides:
**(2)** If the applicant has failed to develop the factual basis of a claim
in State court proceedings, the court shall not hold an evidentiary
hearing on the claim unless the applicant shows that–
**(A)** the claim relies on–
**(i)** a new rule of constitutional law, made retroactive to cases on
collateral review by the Supreme Court, that was previously
unavailable; or
**(ii)** a factual predicate that could not have been previously
discovered through the exercise of due diligence; . . . .

## DISCUSSION

## I

Mr. Valdez first claims that his July 25 taped confession and his July 26 statements to Agent Irwin were obtained in violation of his Fifth Amendment rights. He argues that due to his poor command of the English language he did not knowingly and intelligently waive his constitutional rights on July 25 as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). He also contends he invoked his Fifth Amendment right to counsel on July 25, making his statements to Agent Irwin the following day inadmissible under *Edwards v. Arizona*, 451 U.S. 477 (1981) (holding inadmissible defendant's uncounseled statements made during custodial interrogation when defendant had previously invoked Fifth Amendment right to have counsel present). We address each argument in turn.

### A. *Miranda* Waiver

Mr. Valdez's claim that he did not knowingly and intelligently waive his *Miranda* rights is based upon his assertion that he did not understand those rights as read to him in English. Although the ultimate question of whether Mr. Valdez's waiver was knowing and intelligent is subject to review under the standards set forth in section 2254(d), *see Pickens v. Gibson*, 206 F.3d 988, 995 (10th Cir. 2000), any subsidiary factual findings made by the state court are entitled to a presumption of correctness under section 2254(e), *see id.* at 994. *See*

-11-

*also Trice*, 196 F.3d at 1169 (although ultimate question of whether petitioner's confession was voluntary reviewed under section 2254(d), subsidiary factual findings entitled to section 2254(e)'s presumption of correctness).

Whether Mr. Valdez understood his *Miranda* rights is a question of fact, *see Mincey v. Head*, 206 F.3d 1106, 1131 (11th Cir. 2000); *Cuppett v. Duckworth*, 8 F.3d 1132, 1141 (7th Cir. 1993) (en banc); *Derrick v. Peterson*, 924 F.3d 813, 823-24 (9th Cir. 1990), which underlies the legal question of whether his waiver was knowing and intelligent, *see Perri v. Department of Corrections*, 817 F.2d 448, 451 (7th Cir. 1987). We therefore must presume the OCCA's factual finding that Mr. Valdez "fully comprehended what was being said to and asked of him," *Valdez*, 900 P.2d at 371, is correct unless Mr. Valdez convinces us otherwise by clear and convincing evidence. *See* § 2254(e)(1).

Mr. Valdez did not offer any additional evidence and merely argues from the trial record that he did not fully comprehend English and thus did not knowingly and intelligently waive his *Miranda* rights. After a close reading of the entire record, we agree with the state court that it establishes Mr. Valdez's understanding of English. In particular, Mr. Valdez's responses to questions during his July 25 interrogations, *see* Rec., Supp. Ex. 2, and during his lengthy trial testimony, *see* Rec., vol. V at 10-103, convince us that while he had some limitations in his ability to speak English and therefore occasionally referred to an

interpreter to express himself at trial, he fully comprehended what was being asked of him and explained to him. *See, e.g.*, *United States v. Todisco*, 667 F.2d 255, 260 (2d Cir. 1981) (defendant's in-court behavior supported trial court's finding that defendant understood *Miranda* rights read to him in non-native language).

In sum, we agree with the OCCA's exhaustive review of the record, *see Valdez*, 900 P.2d at 371-72, and its conclusion based thereon that "Valdez's assurances over the course of the evening that he understood his *Miranda* rights, coupled with his objectively verifiable ability to understand and answer the questions posed to him during the final interrogation, provide sufficient proof that he knowingly and intelligently waived his *Miranda* rights prior to confessing on July 25th, 1989." *Id.* at 372. Because Mr. Valdez has not provided any further evidence, clear and convincing or otherwise, to rebut this finding, we reject his assertion that he did not understand English. Consequently, we agree with the OCCA that he knowingly and intelligently waived his rights on July 25.

### B. *Invocation of Fifth Amendment Right to Counsel*

Mr. Valdez's next Fifth Amendment claim is based upon his assertion that he requested counsel during the interrogation at his home on July 25. In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Court held that after an accused clearly invokes his right to have counsel present during a custodial interrogation, officers

must cease all questioning and may not reinitiate questioning on any matter until counsel is provided. *See id.* at 484-85 (the "*Edwards* rule"). Relying on *Edwards*, Mr. Valdez contends his July 26 interrogation by Agent Irwin without counsel present violated his Fifth Amendment rights because it occurred after he invoked his right to counsel the previous day. Therefore, he argues, Agent Irwin's testimony was inadmissible at trial.

On the evening of July 25, after Deputy Cunningham convinced Mr. Valdez to show him where he disposed of Mr. Barron's body, he presented Mr. Valdez with a *Miranda* waiver form which Mr. Valdez signed. The officers then taped Mr. Valdez's subsequent confession. Investigator Benson concluded the interrogation by asking Mr. Valdez whether his confession was voluntarily made and whether he willingly signed the *Miranda* waiver form. Mr. Valdez replied: "Yes, I understand it a little bit and I sign it because I understand it something about a lawyer and he want to ask me questions and that's what I'm looking for a lawyer." Rec., Supp. Ex. 1 at 5. Investigator Benson replied, "But you are willingly talking to us? We didn't beat you or anything like that to get you to talk did we?" *Id.* After a barrage of questions along this line, and without a response from Mr. Valdez, Investigator Benson asked once more, "you talked to us because you wanted to didn't you?" *Id.* Mr. Valdez responded, "Yea." The officers then ended the taped statement. Mr. Valdez argues that his first response was an

-14-

unequivocal invocation of his Fifth Amendment right to have counsel present during the custodial interrogation.

In *Davis v. United States*, 512 U.S. 452 (1994), the Court described the *Edwards* rule as requiring courts to "determine whether the accused *actually invoked* his right to counsel." *Id.* at 458. The Court stated that reviewing courts must make this objective inquiry with the understanding that "a statement either is such an assertion of the right to counsel or it is not." *Id.* at 459. The Court held that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," the *Edwards* rule requiring a cessation of questioning does not apply. *Id.* at 459.

Mr. Valdez unsuccessfully raised this challenge in his direct appeal. *See Valdez*, 900 P.2d at 374. Reviewing the issue, the OCCA described the circumstances as they existed on July 25, prior to Mr. Valdez's purported invocation. Applying *Davis* to those circumstances, the court determined that Mr. Valdez's statement was "[a]t most . . . an ambiguous request for counsel." *Id.* The OCCA therefore held that Mr. Valdez's subsequent uncounseled interrogation on July 26 did not violate his Fifth Amendment rights.

Whether a statement constitutes an unequivocal request for counsel under *Davis* is a question of law, *see United States v. Oba*, 978 F.2d 1123, 1129 (9th

Cir. 1992), which we review under AEDPA § 2254(d) if the state has addressed the issue on the merits, *see LaFevers v. Gibson*, 182 F.3d 705, 711 (10th Cir. 1999), *cert. denied*, 120 S. Ct. 1290 (2000). Mr. Valdez asserts the OCCA's determination is both contrary to, and an unreasonable application of, *Davis*. *See* § 2254(d)(1). The OCCA correctly cited *Davis* and applied its holding when reviewing this claim, and Mr. Valdez does not argue otherwise. For this reason, its determination is not contrary to *Davis*. *See Williams*, 120 S. Ct. at 1519-20. Hence, for Mr. Valdez to obtain habeas relief on this claim, he must convince us the OCCA's determination "unreasonably applies [*Davis*] to the facts of [his] case." *Id.* at 1520. We agree with the district court that it did not.

The OCCA's conclusion that Mr. Valdez's reference to an attorney was insufficient to invoke his Fifth Amendment right to counsel under *Davis* was not unreasonable. At the outset, we agree with the OCCA that a plain reading of Mr. Valdez's statement is ambiguous, particularly because it was made *after* he had given a taped confession and showed police where he had burned the body, undermining his need for the aid of counsel during the interrogation. *See, e.g.*, *United States v. Scurlock*, 52 F.3d 531, 537 (5th Cir. 1995) (where accused confessed, agreed to give a recorded statement, was read *Miranda* rights and asked if she was willing to answer questions, accused's subsequent comment that she needed a lawyer was insufficient under *Davis* to invoke her Fifth Amendment

-16-

right to counsel); *Lord v. Duckworth*, 29 F.3d 1216, 1221 (7th Cir. 1994) (accused's statement "I can't afford a lawyer but is there anyway I can get one?," was ambiguous because accused had twice been informed of *Miranda* rights and had already confessed in lengthy, tape-recorded statement).

In *Davis*, the Supreme Court "recognize[d] that requiring a clear assertion of the right to counsel might disadvantage some suspects who—because of . . . [a] lack of linguistic skills . . . —will not clearly articulate their right to counsel although they actually want to have a lawyer present." *Davis*, 512 U.S. at 460. Despite this, the Supreme Court rejected any further prophylactic protections for an accused's Fifth Amendment right to counsel, holding instead that the primary protection is the accused's comprehension of the *Miranda* warnings themselves. *Id.* As discussed above, Mr. Valdez had been read his rights three times prior to making this statement, and the record supports the OCCA's determination that he understood those rights and that he knowingly and intelligently waived his right to counsel. In light of this, and the fact that Mr. Valdez's statement came after he confessed, the OCCA's determination that Mr. Valdez's statement was an ambiguous request for counsel is not an objectively unreasonable application of *Davis*.

## II

Mr. Valdez next claims that his Sixth Amendment right to counsel was

violated by Agent Irwin's July 26 interrogation of him without the presence of his appointed counsel representing him on the murder charge. He argues the statements he made about the murder during that interrogation were therefore inadmissible under *Michigan v. Jackson*, 475 U.S. 625 (1986) (applying *Edwards* rule to Sixth Amendment and holding a defendant's waiver of Sixth Amendment right to counsel invalid when made during post-arraignment, police-initiated interrogations).

Mr. Valdez unsuccessfully raised this argument in his direct appeal. The OCCA first recognized that under *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991), the Sixth Amendment right is offense-specific. Agent Irwin was therefore free to question Mr. Valdez on his immigration status without implicating Mr. Valdez's Sixth Amendment rights because that interrogation did not relate to the murder charge. *See Valdez*, 900 P.2d at 374. The OCCA held that Agent Irwin limited his interrogation to Mr. Valdez's immigration status, and that Mr. Valdez waived his Sixth Amendment right by "initiat[ing] the exchange about the murder charges" and then making "spontaneous and unsolicited remarks about the killing." *Id.* at 375.

Mr. Valdez contends he is entitled to relief under section 2254(d)(1) because the OCCA's determination was contrary to, or an unreasonable application of, *Michigan v. Jackson*, 475 U.S. 625. Mr. Valdez also maintains the

OCCA's holding was based on an unreasonable determination of the facts under section 2254(d)(2), claiming Agent Irwin intentionally created a situation in which Mr. Valdez would make incriminating statements in violation of his Sixth Amendment right to counsel.

The district court rejected both of these arguments. It first noted that Mr. Valdez had not proffered clear and convincing evidence that the OCCA's factual determinations regarding the July 26 interrogation were erroneous and thus those facts were presumed correct, *see* 28 U.S.C. § 2254(e)(1). Relying on *McNeil*, 501 U.S. 171, the district court held that Agent Irwin's interrogation was not a violation of Mr. Valdez's Sixth Amendment right to counsel because the subject matter of the interrogation was limited to Mr. Valdez's immigration status, a topic on which Mr. Valdez had not been charged. Citing our recent decision in *Cooks v. Ward*, 165 F.3d 1283 (10th Cir. 1998), *cert. denied*, 120 S. Ct. 94 (1999), the court further held the OCCA's determination that Mr. Valdez waived his Sixth Amendment right to counsel by initiating the discussion with Agent Irwin regarding the murder was not contrary to, or an unreasonable application of, Supreme Court precedent. We agree.

### A. Waiver by Initiating Discussion of Charges

Because Mr. Valdez had been arraigned on the murder charge and had been appointed counsel, it is beyond dispute that his Sixth Amendment right to counsel

for the murder had attached at the time of Agent Irwin's July 26 interrogation.

According to the OCCA's recitation of the facts, Agent Irwin confined his

questions to Mr. Valdez's immigration status and did not interrogate Mr. Valdez

regarding the murder. It was Mr. Valdez himself who initiated the discussion

regarding the murder, despite Agent Irwin's reminders that he was there regarding

Mr. Valdez's immigration status and that Mr. Valdez did not have to discuss the

murder charges. *See Valdez*, 900 P.2d at 375. Mr. Valdez did not challenge these

facts at trial and does not challenge them here, thus they are presumed correct.

*See* 28 U.S.C. § 2254(e)(1).

The OCCA's determination that Mr. Valdez voluntarily waived his Sixth

Amendment rights by initiating discussion about the charged crime is a question

of law, *see Cooks*, 165 F.3d at 1288, which we review pursuant to AEDPA §

2254(d). *See Holman v. Kemna*, 212 F.3d 413 (8th Cir. 2000) (applying § 2254(d)

to review state court determination of whether defendant initiated conversation

with police ). In *Jackson*, the Supreme Court held the Sixth Amendment right to

counsel could not be waived during post-arraignment, police-initiated

interrogations. *See Jackson*, 475 U.S. at 635-36. In *McNeil v. Wisconsin*, 501

U.S. 171, the Court clarified this holding by stating that the Sixth Amendment

right is offense-specific, meaning *Jackson*'s holding invalidates only those

waivers made during police-initiated interrogations covering *the subject matter of*

*the charged offense. See id.* at 175. In practice, this means that once the right attaches (usually at the defendant's arraignment), the police may not initiate an uncounseled interrogation of the defendant on a subject dealing with the offense for which he is charged, *see id.* at 176, but may initiate an uncounseled interrogation on uncharged offenses.

Mr. Valdez asserts that because Agent Irwin's interrogation was post-arraignment and police-initiated, the OCCA should have held his Sixth Amendment waiver invalid under *Jackson*. This argument ignores the fact that Mr. Valdez retained the ability to waive his Sixth Amendment right to counsel by voluntarily reinitiating a discussion with police regarding the crime for which he was charged without counsel present. *See, e.g.*, *Michigan v. Harvey*, 494 U.S. 344, 352 (1990) ("[N]othing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of an attorney."); *Patterson v. Illinois*, 487 U.S. 285, 290-91 (1988) (defendant's Sixth Amendment waiver was valid where confession was self-initiated and voluntary); *Clayton v. Gibson*, 199 F.3d 1162, 1172-73 (10th Cir. 1999) (post-arraignment Sixth Amendment waiver made while defendant was being booked on a different charge was valid because defendant voluntarily reinitiated communication with officers regarding the charged crime), *petition for cert. filed*, No. 99-9630 (May 20, 2000); *Cooks*, 165 F.3d at 1288

(defendant's Sixth Amendment waiver was valid where defendant summoned detective to his cell and insisted on confessing to charged crime without attorney present).

The parties do not cite, nor are we aware of any, Supreme Court precedent dealing with the exact situation we have here where a Sixth Amendment waiver was made during a police-initiated interrogation regarding uncharged crimes. In the procedural posture of this case, *Williams* requires us to deny habeas relief unless Mr. Valdez can show the OCCA's decision rests upon an objectively unreasonable application of Supreme Court precedent to these new facts. *See Williams*, 120 S. Ct. at 1520.

As the OCCA recognized, the essence of the Court's holding in *Jackson* was that the "Sixth Amendment right to counsel at a post-arraignment interrogation requires at least as much protection [afforded by the *Edwards* rule] as the Fifth Amendment right to counsel at any custodial interrogation.'" *Valdez*, 900 P.2d at 374 n.44 (quoting *Jackson*, 475 U.S. at 632). The Court therefore held that the *Edwards* rule applied to Sixth Amendment waivers as well. *See Jackson*, 475 U.S. at 632. Importantly, the Court in *Jackson* expressed the *Edwards* rule as allowing an exception for interrogations which were initiated by the defendant himself. *See id.* at 626 (*Edwards* rule protects an accused whose constitutional right to counsel has attached, shielding him from "further

-22-

interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges or conversations with the police*") (emphasis added). This last exception to the *Edwards* rule must be read in conjunction with *McNeil*'s holding that the police do not violate the Sixth Amendment by initiating an interrogation of a defendant about uncharged crimes. Under the AEDPA standard we are required to apply, we cannot say the OCCA's determination that Mr. Valdez waived his Sixth Amendment right to counsel when he made spontaneous and unsolicited remarks about the killing during the police-initiated interrogation rested upon an objectively unreasonable application of *Edwards*, *Jackson*, and *McNeil* to the new facts presented here. Mr. Valdez is thus not entitled to habeas relief on this point. *See Williams*, 120 S. Ct. at 1520.

**B. *Agent Irwin's Interrogation as a Pretext***

Mr. Valdez also contends the OCCA's holding was based on an unreasonable determination of the facts, entitling him to habeas relief under section 2254(d)(2). Pointing out that Agent Irwin interrogated other Spanish-speaking witnesses regarding the murder and was doing so to aid the state police in their investigation, Mr. Valdez asserts that Agent Irwin was merely using Mr. Valdez's immigration status as a pretext to elicit admissions from him about the charged crime. The OCCA rejected this view of the facts, holding that "[w]hile

-23-

Irwin arguably presented Valdez with a comfortable environment in which to talk about the crime, he did not question Valdez about that crime" and he "did not badger Valdez into talking." *Valdez*, 900 P.2d at 375. Our review of the facts presented at trial in light of the relevant caselaw persuades us the OCCA's determination of these facts was not unreasonable.

Where government officials *must have known* that a defendant will make incriminating statements about a charged crime, their interrogation on uncharged crimes without counsel present clearly violates the Sixth Amendment. *See Maine v. Moulton*, 474 U.S. 159, 176-77 & n.12 (1985) (government's arrangement to record post-arraignment conversations between defendant and co-defendant violated defendant's Sixth Amendment right to counsel because the government "*must have known* that its agent was likely to obtain incriminating statements from the accused"); *United States v. Henry*, 447 U.S. 264, 270-71 (1980) (Sixth Amendment violated where informant cell-mate of defendant was paid only if he produced useful information because police "must have known" that informant would take affirmative steps to obtain incriminating evidence regarding the charged crime notwithstanding instructions to the contrary); *see also United States v. Terzado-Madruga*, 897 F.2d 1099, 1109-10 (11th Cir. 1990) (where government agents "must have known" the informant would obtain incriminating statements from defendant regarding charged crimes, statements taped during

those conversations were inadmissible). Mr. Valdez maintains this was the situation here. He analogizes Agent Irwin to the jail-house informant in *Henry* who was surreptitiously employed to receive incriminating information regarding a charged crime, arguing that the government must have known Agent Irwin would obtain incriminating statements from Mr. Valdez during the interview. In *Henry*, however, the Court specifically relied upon the fact that the defendant did not know he was speaking to a government agent or that his statements could be used against him. *See Henry*, 447 U.S. at 273. Mr. Valdez's analogy is therefore inapposite because he knew he was speaking to a government official and his statements could be used against him.

Agent Irwin testified that he did not ask Mr. Valdez any questions regarding the murder during his interrogation. Moreover, he specifically told Mr. Valdez he did not have to offer information about the homicide when Mr. Valdez raised the subject. The fact that Agent Irwin may have hoped Mr. Valdez would volunteer information, "by luck or happenstance," does not result in a Sixth Amendment violation. *Moulton*, 474 U.S. at 176. In light of this evidence, it was not an unreasonable determination of the facts for the OCCA to conclude no Sixth Amendment violation occurred.

### III

Mr. Valdez next asserts there was insufficient evidence to prove he was

sane beyond a reasonable doubt. Under a sufficiency of the evidence challenge, a reviewing court must evaluate the evidence to determine whether "any rational trier of fact" could have found the defendant sane beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because Mr. Valdez established a reasonable doubt of his sanity, under Oklahoma law, the burden shifted to the State to "prove beyond a reasonable doubt that [Mr. Valdez] could distinguish between right and wrong at the time of the offense." *Ullery v. State*, 988 P.2d 332, 348 (Okla. Crim. App. 1999).

The jury was presented with conflicting medical testimony regarding Mr. Valdez's sanity. Dr. Mynatt, who had evaluated Mr. Valdez's sanity for the state, testified that based upon a one hour examination he concluded Mr. Valdez was legally sane, that is, he comprehended the difference between right and wrong at the time of the murder. Dr. Mynatt testified that Mr. Valdez told him he did not lose control on the night of the murder but only wanted to show Mr. Barron the error of his ways. Dr. Romero, a Mexican psychiatrist assisting Dr. Mynatt, described Mr. Valdez as calm and lucid during the interview, and testified that Mr. Valdez admitted he might kill again if faced with the same circumstances.

Mr. Valdez then called his examining psychologist, Dr. Murphy, who had interviewed Mr. Valdez for five hours and administered four tests. Dr. Murphy opined that at the time of the killing Mr. Valdez was acting under the delusion

that God was commanding him to convert Mr. Barron and was thus unable to appreciate right from wrong. During the State's rebuttal,[3] Dr. Mynatt testified the tests administered by Dr. Murphy could not have assessed Mr. Valdez's mental condition as it existed at the time of the crime. Dr. Romero testified he agreed with Dr. Mynatt that Mr. Valdez appreciated the difference between right from wrong on the night of the murder.

Mr. Valdez undermined Dr. Murphy's theory by testifying that God did not command him to kill Mr. Barron, or to kill homosexuals generally. He also testified that certain passages of the Bible teach that homosexuals do not deserve to live. He said he did not really know why he killed Mr. Barron but did so when Mr. Barron refused to listen to his sermon denouncing homosexuality. Finally, Mr. Valdez testified he might kill another person who, like Mr. Barron, refused to listen to his teachings.

The jury also heard testimony from several witnesses who were with Mr. Valdez in the bar on the night of the murder. None testified that Mr. Valdez seemed mentally unstable. With the exception of Mr. Orduna, who actually witnessed the killing, all of these witnesses testified that Mr. Valdez did not appear to be angry at Mr. Barron.

---

[3]Both Dr. Mynatt and Dr. Romero heard Mr. Valdez's trial testimony before they testified on rebuttal.

On direct appeal, Mr. Valdez contended Dr. Murphy's opinion that he was not legally sane at the time of the murder was more credible than Drs. Romero's and Mynatt's conclusions because the latter were based upon cursory sanity evaluations. *See Valdez*, 900 P.2d at 375. In reviewing this argument, the OCCA remarked that Mr. Valdez's sanity was a "question of fact for the sole determination of the jury," and that it would not "inquire into the credibility of the witnesses nor weigh conflicting testimony." *Id.* at 376. The OCCA concluded the evidence was sufficient to uphold the jury's finding that Mr. Valdez was sane beyond a reasonable doubt based on the "testimony from witnesses who were with Valdez at the time of the crime, from the doctors who later evaluated Valdez's mental condition, and from Valdez himself." *Id.* at 377.

A claim based on sufficiency of the evidence is a mixed question of fact and law which we reviewed de novo under the pre-AEDPA habeas caselaw. *See Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995). Habeas relief was granted only if, considering all of the evidence in the light most favorable to the government, a rational trier of fact could not have found the defendant was sane beyond a reasonable doubt at the time of the crime. *See id.* (citing *Jackson v. Virginia*, 443 U.S. at 319). Under AEDPA, however, where a habeas petitioner's sufficiency of the evidence challenge has already been decided in state court, we employ a more limited review under either section 2254(d)(1) or (d)(2). Under

-28-

Tenth Circuit caselaw, it is unclear whether subsection (d)(1) or (d)(2) applies to the review of mixed questions of law and fact presented when reviewing for sufficiency of evidence questions. *See Hogan v. Gibson*, 197 F.3d 1297, 1306 (10th Cir. 1999) (describing conflict in our cases), *petition for cert. filed*, No. 99-1976 (June 8, 2000). Because Mr. Valdez raises this argument under both subsections (d)(1) and (d)(2), we need not decide which is the more appropriate analysis.

Mr. Valdez first asserts under section 2254(d)(1) that the OCCA applied state evidentiary law, contrary to the Federal constitutional standard for sufficiency of evidence set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Williams*, 120 S. Ct. at 1519. This assertion is without merit. *Jackson* instructs the reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The OCCA cited a state law case rather than *Jackson*, but it correctly articulated and applied the *Jackson* standard for a sufficiency of evidence review. It recognized "the State bears the burden of proving beyond a reasonable doubt" that the defendant does not fall within the state's legal definition of insanity. *Valdez*, 900 P.2d at 375. After determining that the jury had been correctly instructed on this matter, the OCCA thoroughly reviewed the testimony and

concluded the evidence was sufficient to support the jury's conclusion that Mr. Valdez was sane beyond a reasonable doubt, *see id.* at 376-77 (citing *Kiser v. State*, 782 P.2d 405, 407 (Okla. Crim. App. 1989)). Despite Mr. Valdez's contention that this was an incorrect application of "state evidence law," this standard is the same whether cited from the *Jackson* opinion or from state caselaw. The OCCA's application of this standard was thus in accordance with federal constitutional requirements.

Mr. Valdez also contends the OCCA's determination that the evidence was sufficient was an objectively unreasonable determination of the facts, entitling him to habeas relief under section 2254(d)(2). He first maintains the OCCA should have disregarded the expert witness testimony of Drs. Romero and Mynatt because it was less credible than the testimony of Dr. Murphy, due to his extensive testing. As the OCCA recognized, whether Dr. Murphy's testimony at trial was more credible was an issue solely within the province of the jury.[4] *See United States v. Castaneda-Reyes*, 703 F.2d 522, 524 (11th Cir. 1983) (whether testimony of one expert witness is more believable than testimony of another

---

[4]In presenting this argument, Mr. Valdez merely recasts the evidence presented at trial in a light most favorable to himself. Because the jury was correctly instructed on the issue and determined Mr. Valdez sane beyond a reasonable doubt, a reviewing court must view the evidence in a light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319; *United States v. Hanzlicek*, 187 F.3d 1228, 1232-33 (10th Cir. 1999).

expert witness is issue for trier of fact); *United States v. Walker*, 524 F.2d 1125,

1128 (10th Cir. 1975) (same).  Despite the relative strengths of the expert

testimony, only the fact-finder may determine whether the defendant was legally

sane.  *See, e.g.*, *United States v. Madrid*, 673 F.2d 1114, 1123 (10th Cir. 1982)

(evidence of sanity was sufficient to sustain conviction although four of five

experts concluded defendant was not legally sane); *Walker*, 524 F.2d at 1128-29

(same where defense expert who extensively examined defendant testified

defendant was not legally sane but state expert who conducted limited

examination and did not hear trial testimony testified defendant was); *see also*

*United States v. Shepard*, 538 F.2d 107, 110 (6th Cir. 1976); *United States v.*

*Bohle*, 475 F.2d 872, 874 (2d Cir. 1973).

Moreover, the OCCA did not rely solely on the expert testimony in holding

the evidence was sufficient; it also considered the testimony from "witnesses who

were with Valdez at the time of the crime" and the testimony of Mr. "Valdez

himself."[5]  *Valdez*, 900 P.2d at 377.  Because of the OCCA's deference to the jury

---

[5]Although Mr. Valdez does not attempt to refute his own testimony, he does argue that testifying he would kill again if presented with a similar situation was itself proof he was legally insane, and that the OCCA was unreasonable in failing to construe the testimony in this light.  *See* Aplt. Reply Br. at 13 ("If a man on trial for his life fully understood the wrongfulness of killing another, and appreciated the nature and consequences of such conduct, would he tell the State's examiner that he would do the same thing again?  The very insanity of that proposition seems lost on the state court.").  While a defense attorney may

(continued...)

on the sufficiency of the evidence issue, *see Valdez*, 900 P.2d at 376, we cannot characterize its determination as unreasonable. *See, e.g.*, *Billotti v. Legursky*, 975 F.2d 113, 118-19 (4th Cir. 1992) (evidence held sufficient to support finding of sanity where jury heard from lay witnesses regarding defendant's conduct at time of crime even though all experts testified defendant was not legally sane at time of crime); *cf. United States v. Samuels*, 801 F.2d 1052, 1056 (8th Cir. 1986) (evidence held insufficient to prove sanity where defendant had extensive history of psychiatric problems, government's only evidence on sanity issue was expert testimony based on limited examination of defendant, and no lay persons could testify as to defendant's mental state at the time of the offense).

Mr. Valdez also argues the testimony at trial shows he was suffering from paranoid delusions resulting in an "avenging angel complex," during which he enforced what he believed to be biblical requirements without any corresponding feeling of wrong-doing. The only new evidence he offers in support of his position is a deposition taken of Dr. Mynatt in December 1997, seven and a half years after the trial. In this deposition, Dr. Mynatt stated he did not remember

---

[5](...continued)
understandably believe his client "insane" for testifying honestly about his emotions where such testimony devastates his defense strategy, the inferences to be made from Mr. Valdez's testimony are purely matters for the jury. *See United States v. Bilson*, 648 F.2d 1238, 1239 (9th Cir. 1981) (selection from among the competing factual inferences arising from the proffered evidence of sanity was for jury and appellate court is not free to disturb that conclusion).

Mr. Valdez or testifying at his trial, even after seeing a picture of Mr. Valdez. *See* Rec., Dep. of Dr. Mynatt at 7, 34. Dr. Mynatt did testify that a person suffering from an "avenging angel complex" normally does not appreciate the difference between right and wrong, and would therefore not be legally sane. *Id.* at 26. He also testified that an individual suffering from this disorder might seem normal in some areas, and that the disorder could be exacerbated by alcohol. *Id.* at 23, 25. Significantly, however, Dr. Mynatt did not testify he had changed his opinion and now believed Mr. Valdez was suffering from this complex at the time of the murder, nor did he testify that Mr. Valdez was not legally sane at the time he committed the crime. None of this testimony contradicts or calls into question his testimony at trial. Moreover, Dr. Mynatt testified that whatever the basis was for his opinion given at trial, it was "much clearer" at that time than seven and a half years later when being deposed. *Id.* at 36. For these reasons, this evidence does not undermine the jury's evaluation of Dr. Mynatt's trial testimony or the OCCA's review.

## IV

Mr. Valdez appeals the district court's denial of his procedural and substantive competency claims. "A defendant is competent to stand trial if he 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [and if] he has a rational as well as a factual

understanding of the proceedings against him.'" *Walker v. Oklahoma*, 167 F.3d 1339, 1343 (10th Cir. 1999) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)), *cert. denied*, 120 S. Ct. 449 (1999). In *Walker*, we held that a petitioner states a procedural competency claim by alleging the trial court failed to hold a competency hearing after the defendant's mental competency was put in issue, and that to prevail "a petitioner must establish that the state trial judge ignored facts raising a 'bona fide doubt' regarding the petitioner's competency to stand trial." *Id.* at 1343. To state a substantive competency claim, on the other hand, a petitioner must allege "he was, in fact, tried and convicted while mentally incompetent," and "must demonstrate his or her incompetency by a preponderance of the evidence.'" *Id.* Mr. Valdez asserts the trial court erred in failing to suspend the proceedings during trial and re-evaluate his competency in violation of his procedural due process rights, and that he was tried while incompetent in violation of his substantive due process rights. The former claim may be defaulted, but is subject to a less demanding standard of review; the latter cannot be defaulted, but is subject to a higher standard of review. *See id.* at 1343-44.

Prior to Mr. Valdez's trial, his counsel requested a competency examination and a post-examination competency hearing, both of which were granted. During the hearing, the trial court required Mr. Valdez to prove his incompetency by clear and convincing evidence, a standard subsequently struck down by the

Supreme Court in *Cooper v. Oklahoma*, 517 U.S. 348, 369 (1996). Because Mr. Valdez's direct appeal was decided before *Cooper*, he raised the standard-of-proof issue in a state post-conviction proceeding. *See Valdez*, 933 P.2d 931. Applying the 1995 amendments of Oklahoma's post-conviction statute,[6] which greatly circumscribed the state courts' power to apply intervening changes in the law to capital post-conviction applicants, the OCCA held his claim procedurally barred due to his failure to raise it on direct appeal.

The district court agreed that the state's procedural bar applied to Mr. Valdez's procedural competency claim and refused to consider it. *See* Dist. Ct. Op. at 31 (citing *Nguyen v. Reynolds*, 131 F.3d 1340, 1346 (10th Cir. 1997)). The district court rejected Mr. Valdez's substantive competency claim on the merits.

Both the OCCA and the district court erroneously held Mr. Valdez's procedural competency claim barred for his failure to raise it during his direct appeal. We have held that Oklahoma's 1995 statutory amendments cannot stand as a procedural bar to *Cooper* claims not raised on direct appeal when the direct appeal pre-dated the effective date of the amendments. *See Clayton v. Gibson*, 199 F.3d 1162, 1171 (10th Cir. 1999), *petition for cert. filed*, No. 99-9630 (May 20, 2000); *Rogers*, 173 F.3d at 1290; *Walker*, 167 F.3d at 1345. Since Mr. Valdez's direct appeal was decided March 15, 1995, prior to the November 1,

---

[6]*See* OKLA. STAT. tit. 22, § 1089(D)(9) (Supp. 1999).

1995 effective date of Oklahoma's post-conviction statutory amendments, the procedural bar cannot be applied to Mr. Valdez's case. We therefore review the merits of his procedural competency claim.

A defendant is competent to stand trial if he is able to consult with his lawyer "with a reasonable degree of rational understanding," and if he has both a "rational" and "factual" understanding of the proceedings against him. *Walker*, 167 F.3d at 1343 (quoting *Dusky*, 362 U.S. 402). To obtain habeas relief on his procedural competency claim, Mr. Valdez must show that the trial court ignored evidence which, viewed objectively, raised a bona fide doubt regarding his competency to stand trial. *See Rogers*, 173 F.3d at 1290; *Walker*, 167 F.3d at 1345. When reviewing the record for evidence bearing on competency, a court must look at the defendant's behavior and demeanor at trial, together with any prior medical opinions on his competency.[7] *See Barnett v. Hargett*, 174 F.3d 1128, 1134 (10th Cir. 1999) (citing *Drope v. Missouri*, 420 U.S. 162, 180 (1975)).

As previously noted, Mr. Valdez raised the issue of his competency prior to trial and requested a psychiatric examination. Dr. John Quinn was appointed by

---

[7]The district court here specifically held that only the expert testimony was probative on the issue of Mr. Valdez's competence. *See* Dist. Ct. Op. at 35. We agree with Mr. Valdez that this holding was erroneous as it foreclosed the district court's review of Mr. Valdez's own testimony. Upon our de novo review of this testimony, however, we are persuaded it does not raise doubts regarding Mr. Valdez's competency at the time of trial.

the court to examine Mr. Valdez. After interviewing Mr. Valdez, Dr. Quinn concluded he was competent to stand trial. At the post-examination competency hearing, Dr. Quinn testified that he spent one and a half hours evaluating Mr. Valdez. He opined that Mr. Valdez was able to participate and assist in his defense and that he understood the nature and potentially severe consequences of the charge against him.[8]

None of the experts at trial testified Mr. Valdez was incompetent to stand trial. Indeed, Dr. Mynatt, who had examined Mr. Valdez the previous week, testified Mr. Valdez was competent. Despite Mr. Valdez's assertions that his "avenging angel complex" caused him to be incompetent, none of Dr. Quinn's testimony at the competency hearing or any of the experts' testimony at trial revealed that Mr. Valdez's religious beliefs interfered with his perceptions of reality. In addition, there is no evidence in the record that Mr. Valdez acted irrationally or was disruptive during any of the proceedings against him. *See, e.g.*, *Bryson*, 187 F.3d at 1204.

"Notwithstanding the difficulty of making evaluations of the kind required

---

[8]Mr. Valdez criticizes Dr. Quinn's testimony as only finding Mr. Valdez had an orientation to time and place and a recollection of events. This ignores his further testimony that Mr. Valdez regretted his acts, his thought processes were coherent and consistent, and he was goal oriented towards his religious beliefs, *see* Tr. of Competency Hearing at 7-11, all tending to show a rational understanding of reality.

in these circumstances," *Drope*, 420 U.S. at 179, our review of Mr. Valdez's own testimony convinces us he was competent at the time of trial. His "behavior on the stand was neither irrational nor unusual. His testimony was responsive to the questions asked, logical, and coherent." *Foster v. Ward*, 182 F.3d 1177, 1191 (10th Cir. 1999), *cert. denied*, 120 S. Ct. 1438 (2000). Mr. Valdez characterizes specific parts of his testimony as bizarre and irrational, and strenuously argues that his incompetence is demonstrated on the record by the fact that he candidly admitted things that helped the State convict him and that demonstrated his supposed future dangerousness.[9] However damaging his testimony was, nothing in it reveals or suggests Mr. Valdez was incompetent to stand trial. Quite the opposite, his testimony shows a consistency in thought process and an admitted religious bias toward homosexuals. Such beliefs do not equate with incompetence, and we disagree with Mr. Valdez that his "irrational" convictions precluded him from accurately perceiving reality, *cf. Lafferty v. Cook*, 949 F.2d 1546, 1554-56 (10th Cir. 1991) (discussing paranoid delusions and their effect on a defendant's rational understanding of the proceedings). After reviewing the

---

[9]In this regard, Mr. Valdez points to his testimony that he quoted to Mr. Barron out of the Bible; that he wanted to castrate Mr. Barron; that he wanted to change Mr. Barron and killed him because he would not listen to his proselytizing; that he might commit this crime again if presented with the same circumstances; and that he rolled Mr. Barron up in the carpet "like a taco." *See* Pet. Br. at 61-62.

record, we conclude the evidence before the trial court did not raise a bona fide doubt about Mr. Valdez's competency at the time of trial.

With respect to Mr. Valdez's substantive comptency claim, the only new evidence Mr. Valdez presented on his mental capacity was the deposition of Dr. Mynatt taken seven and one-half years after trial. This additional evidence has no probative value with respect to Mr. Valdez's competency to stand trial. *See supra* at 32-33. Because Mr. Valdez does not meet the lower standard of review for his procedural due process claim and does not provide additional evidence of his incompetency at the time of trial, *see Nguyen v. Reynolds*, 131 F.3d 1340, 1345-47 (10th Cir. 1997) (considering post-conviction evidence in the context of a substantive competency claim), he also cannot "satisfy the more demanding standard for a substantive claim." *Walker*, 167 F.3d at 1347. *See also Rogers*, 173 F.3d at 1291 n.13. We therefore deny his request for relief on his substantive competency claim as well.

## V

Mr. Valdez's next claim for relief is founded on his assertion that the trial court's failure to give a jury instruction on second degree murder violated his due process rights as set forth by the Supreme Court in *Beck v. Alabama*, 447 U.S. 625 (1980). The Court held in *Beck* that in a capital murder trial, failure to give an instruction on a lesser-included non-capital offense which is supported by the

evidence violates the defendant's due process rights by placing the jury in an "all-or-nothing" position to acquit or find the defendant guilty of a capital crime. *See id.* at 633-35. This holding was limited in *Schad v. Arizona*, 501 U.S. 624, 646 (1991), where the Court held that due process does not require the jury to be instructed on *every* non-capital lesser-included offense supported by the evidence, just that the jury may not be placed in an "all-or-nothing" position when the evidence supports a third option. *See, e.g.*, *Paxton v. Ward*, 199 F.3d 1197, 1205 (10th Cir. 1999) (*Beck* requirement satisfied when jury is given option of at least one lesser-included offense which was supported by evidence).

The jury at Mr. Valdez's trial was instructed on the lesser-included non-capital offense of first degree manslaughter. Mr. Valdez argues the evidence presented at his trial was insufficient to support this instruction and the jury was, in effect, in the same "all-or-nothing" position of central concern in *Beck*. Answering this argument on direct appeal, the OCCA determined that "the evidence reasonably supported an instruction on the non-capital offense of first degree heat of passion manslaughter. . . . Accordingly, the jury in this case was not faced with the all-or-nothing, capital murder or innocence choice condemned in *Beck v. Alabama*." *Valdez*, 900 P.2d at 379.

Mr. Valdez asserts that the OCCA's holding was an unreasonable application of *Beck*, entitling him to habeas relief under section 2254(d)(1). *See*

*Williams*, 120 S. Ct. at 1520. The district court disagreed, concluding that the manslaughter instruction took Mr. Valdez's case outside of the constitutional concerns at issue in *Beck*. In so holding, the district court mischaracterized Mr. Valdez's argument as asserting only an error of state law not implicating constitutional concerns. Mr. Valdez's argument is not simply that his due process rights were violated because the court failed to give a second-degree murder instruction; rather, he argues that because the evidence did not support the only lesser-included offense instruction given, the jury was in fact left without a third option in violation of *Beck*. These circumstances, if present, would amount to a constitutional deprivation, not merely an error of state law. As the Court stated in *Schad*, it was not "suggest[ing] that *Beck* would be satisfied by instructing the jury on just any lesser included offense, even one without any support in the evidence." *Schad*, 501 U.S. at 648. Thus, we must determine whether there was evidence in the record to support the first degree manslaughter instruction, the only lesser-included non-capital offense instruction given. *See, e.g.*, *Montoya v. Collins*, 955 F.2d 279, 285 (5th Cir. 1992) (non-capital lesser-included offense instruction must have support in the record for it to be a "realistic alternative verdict for the jury").

Because the OCCA determined this issue on the merits, our review of its decision is prescribed by AEDPA. If we find the OCCA's determination to be an

unreasonable application of *Beck*'s requirements, Mr. Valdez would be entitled to habeas relief. *See Williams*, 120 S. Ct. at 1520. This argument requires a sufficiency of the evidence review to determine whether the OCCA reasonably concluded there was evidence in the record to support the instruction. We need not decide whether the OCCA's determination was factual or legal, *see Hogan*, 197 F.3d at 1306 (standard of review under AEDPA depends on whether the state court's examination of sufficiency of the evidence for a lesser included offense instruction was a factual or legal conclusion), because we conclude Mr. Valdez's argument is without merit in either event.

The crux of Mr. Valdez's argument is that first degree manslaughter is homicide perpetrated without the intent to effect death, and that this instruction had no support in the record because he admitted he intentionally killed Mr. Barron. This argument is baseless because under Oklahoma law heat of passion manslaughter does not require a lack of intent to kill.[10]  *See Le v. State*, 947 P.2d

---

[10]Instruction No. 11 stated:
No person may be convicted of MANSLAUGHTER IN THE FIRST DEGREE unless the State has proved beyond a reasonable doubt each element of the crime.

| | |
|---|---|
| First: | the death of a human; |
| Second: | the death was not excusable or justifiable; |
| Third: | inflicted by means of a dangerous weapon; |
| Fourth: | caused by the defendant; |
| Fifth: | when performing the conduct which caused the death, defendant were [sic] in the heat of passion. |

(continued...)

-42-

535, 546 (Okla. Crim. App. 1997) (rejecting the state's argument that a first degree heat of passion manslaughter instruction is improper where there is evidence of intent) (cited in *Hooks v. Ward*, 184 F.3d 1206, 1232 (10th Cir. 1999)). *See also Hogan*, 197 F.3d at 1305 n.5 (under Oklahoma law, evidence of intent does not render improper the instruction on manslaughter). Mr. Valdez's admission of intent did not foreclose the jury's consideration of first degree manslaughter, and the OCCA's determination was therefore reasonable.

## VI

Mr. Valdez finally asserts he was denied effective assistance of trial counsel. In order to warrant habeas relief, a petitioner must establish that his attorney's representation was deficient, and that he was prejudiced by that deficient performance. *See Strickland v. Washington*, 466 U.S. 668 (1984). To establish deficient performance, Mr. Valdez must show that his attorney's

---

[10](...continued)
Instruction No. 12 stated:
> Heat of passion exists when four requirements are proven. These requirements are:

| | |
|---|---|
| First: | adequate provocation; |
| Second: | a passion or an emotion such as fear, terror, anger, rage, or resentment existed in defendant; |
| Third: | the homicide occurred while the passion still existed, and before there was a reasonable opportunity for the passion to cool; |
| Fourth: | there was a casual [sic] connection between the provocation, the passion, and the homicide. |

representation "fell below an objective standard of reasonableness." *Id.* at 688. To establish prejudice, Mr. Valdez "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "An ineffective assistance claim may be resolved on either performance or prejudice grounds alone." *Fowler v. Ward*, 200 F.3d 1302, 1310 (10th Cir. 2000).

Mr. Valdez alleges as constitutionally harmful his trial counsel's failure to: (1) sufficiently challenge his competency; (2) move to suppress his confessions or to request a hearing on their voluntariness; and (3) request jury instructions on second degree murder and voluntary intoxication. Mr. Valdez unsuccessfully raised all of these arguments in his direct appeal. *See Valdez*, 900 P.2d at 387-88.

### A. *Failure to Appropriately Challenge Competency*

Mr. Valdez claims the evidence at trial raised serious questions about his competency. He contends his trial counsel's failure to vigorously cross-examine the state's witness at his competency hearing, or to interrupt trial to request another competency determination after Mr. Valdez testified, constituted deficient performance which prejudiced his case. The OCCA concluded that this alleged deficient performance could not have prejudiced Mr. Valdez. *See id.* Although not directly citing to its pre-*Cooper* competency standard, the OCCA must have reviewed this ineffective assistance claim in light of Oklahoma's underlying

-44-

competency standard requiring clear and convincing evidence of incompetency, a standard later held unconstitutional. *See Cooper*, 517 U.S. at 369. Mr. Valdez was therefore not given a "full, fair, and adequate hearing" on this issue in the state court. *Miller*, 161 F.3d at 1253 (§ 2254(e)(2)'s presumption of correctness does not apply in this situation). For this reason, we review de novo the OCCA's determination that Mr. Valdez was not prejudiced by his trial counsel's failure to better present an incompetency defense. *See id.*

Based on the totality of the evidence, we agree with the OCCA that Mr. Valdez was not prejudiced by his trial counsel's failure to better present his alleged incompetence. The evidence presented at the competency hearing and at trial overwhelmingly showed that Mr. Valdez had a rational understanding of reality. *See* discussion *supra* Part IV. At trial, all of the witnesses who knew Mr. Valdez testified he was mentally stable, none of the experts testified that he showed signs of detachment from reality, and none of the officers who interrogated him found him "unusual" or "irrational." Finally, Mr. Valdez testified on his own behalf, answering the questions put to him in a responsive, coherent manner. *See e.g.*, *Bryson*, 187 F.3d at 1203-04. In short, nothing in our review of the record indicates that Mr. Valdez was unable to consult with his lawyer "with a reasonable degree of rational understanding," or that he lacked a rational and factual comprehension of the proceedings against him. *Walker*, 167

F.3d at 1343.  We agree with the OCCA's conclusion that there is no reasonable probability the outcome of Mr. Valdez's trial would have been different but for trial counsel's allegedly deficient performance.

### B.  Failure to Challenge Mr. Valdez's Confessions

Mr. Valdez also claims his trial counsel's failure to challenge his confessions in light of his limited ability to converse in English was both deficient and prejudicial.  The OCCA disagreed, concluding Mr. Valdez's trial would not have been different had this challenge been raised because there was no evidence of involuntariness.  *See Valdez*, 900 P.2d at 388.  Mr. Valdez's argument that this was an unreasonable application of *Strickland* entitling him to habeas relief, *see Williams*, 120 S. Ct. at 1520, is unconvincing.  There was a significant amount of evidence that Mr. Valdez understood English sufficiently to converse with officers and understand the three *Miranda* warnings he received in that language, *see* discussion *supra* Part I.A.  More importantly, however, Mr. Valdez's claim of prejudice is centered around his July 26 confession to Agent Irwin.  Even if Mr. Valdez's July 25 confession had been suppressed, there is no reasonable probability that his July 26 confession – the alleged "devastating" testimony – would be suppressed because Agent Irwin gave *Miranda* warnings and conducted the entire interrogation in Spanish, and that interrogation was not a violation of Mr. Valdez's Fifth or Sixth Amendment rights to counsel.  *See*

discussion *supra* Parts I and II.  This confession would most certainly have survived a motion to suppress, making Mr. Valdez's claim of prejudice unpersuasive.

### C.  Failure to Request Jury Instructions

Mr. Valdez argues that his counsel was constitutionally ineffective for failing to request that the jury be instructed on the defense of voluntary intoxication and the lesser included offense of second degree murder, alleging there was sufficient evidence to support both.  Both of these claims were raised and rejected on direct appeal.  *See Valdez*, 900 P.2d at 378, 388.  As we previously noted, it is not clear under our precedent whether we are to review state determinations of this sort under section 2254(d)(1) or (d)(2).[11]  Again, we need not decide which is the correct approach because we conclude the OCCA was not unreasonable in either its application of the law or its determination of the facts.

Mr. Valdez asserts that the evidence he was "on one of the worst drunks of his life" supported a voluntary intoxication instruction.  His own testimony undermines this argument.  To be entitled to an instruction on the defense of voluntary intoxication, Mr. Valdez had to present evidence sufficient to raise a

---

[11]*But see*, *Hogan*, 197 F.3d 1306 n.5 (noting panel unanimously agreed the correct approach is to treat the determination as a question of law reviewable under section 2254(d)(1)).

reasonable doubt concerning his ability to form the requisite criminal intent. *See, e.g.*, *Fontenot v. State*, 881 P.2d 69, 83 (Okla. Crim. App. 1994). However, Mr. Valdez testified that he knew he was going to kill Mr. Barron beforehand, and in fact told Mr. Barron so. Moreover, he was able to remember and describe the evening's events in explicit detail, and his recollections were corroborated by all of the witnesses who were present on the night of the murder. *See Crawford v. State*, 840 P.2d 627, 638 (Okla. Crim. App. 1992) (defendant's detailed description of the crime and the surrounding circumstances "demonstrate[d] that he was in control of his mental faculties and not in the advanced state of intoxication he attempt[ed] to assert"). The OCCA was therefore not unreasonable in determining that Mr. Valdez was not so intoxicated as to be unable to form intent on the night of the murder. Because the requirements for voluntary intoxication instruction were not met, the OCCA did not unreasonably apply *Strickland* in determining that Mr. Valdez's counsel was not ineffective for failing to request such an instruction.

Mr. Valdez also argues the evidence supported a second degree murder instruction because the murder occurred during a drunken fight. Under Oklahoma law, second degree murder requires a lack of intent. *See, e.g.*, *Palmer v. State*, 871 P.2d 429, 432 (Okla. Crim. App. 1994). Once again, his argument is undermined by his own admission that he intended to kill Mr. Barron before the

-48-

two started fighting.  Consequently, the OCCA was not unreasonable in determining that the evidence did not support a second degree murder instruction. Nor was the OCCA unreasonable in applying *Strickland* to determine that Mr. Valdez's trial counsel was not ineffective for failing to request the instruction.

For these reasons, Mr. Valdez has not shown he is entitled to relief under section 2254 for his claim of ineffective assistance of trial counsel.

### CONCLUSION

Mr. Valdez is not entitled to habeas relief based on the OCCA's determination that: (1) his July 25 and 26 statements were not obtained in violation of his Fifth Amendment rights; (2) his July 26 interrogation did not violate his Sixth Amendment right to counsel; (3) the State proved he was sane beyond a reasonable doubt; (4) he was competent to stand trial; (5) the trial court's failure to instruct the jury on second degree murder did not violate his due process rights; and (6) his trial counsel's ineffectiveness, if any, was not prejudicial to his case.

We **AFFIRM** the district court's denial of Mr. Valdez's request for a writ of habeas corpus.